UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

-------------------------------------------------------X
In re: : Chapter 7
:
MICHAEL S. GOLDBERG, L.L.C. : Case No. 09-23370 (ASD)
MICHAEL S. GOLDBERG : Case No. 09-23371 (ASD)
:
Debtors : (Jointly Administered Under
: Case No. 09-23370)
-------------------------------------------------------X

**MOTION TO APPROVE SETTLEMENT AGREEMENT REGARDING PREFERENCE AND FRAUDULENT CONVEYANCE CLAIMS AGAINST RICHARD AND DIANA MUSCATELLO**

James Berman, Chapter 7 Trustee for the Estates of Michael S. Goldberg and Michael S. Goldberg, LLC, by his undersigned counsel, hereby moves pursuant to Fed. R. Bankr. P. 9019(a) for approval of the attached Settlement Agreement with Richard and Diana Muscatello, and in support thereof, represents the following:

1. Over more than a decade, Michael S. Goldberg ("Mr. Goldberg") and Michael S. Goldberg, LLC ("Debtor LLC") orchestrated a classic Ponzi Scheme (the "Goldberg Scheme").[1]

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. Cunningham v. Brown, 265 U.S. 1 (1924). In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance

1

2.  The Goldberg Scheme promised (and, for a long time, paid) suspicious rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter, in purportedly *risk-free* investments.

3.  Mr. Goldberg represented to investors that he and/or Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Mr. Goldberg represented that he could purchase diamonds, at extremely low wholesale prices, on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay the investor-holders of these purported diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Liquidation

---

of profitability and attract new investors so as to perpetuate the scheme. See Bear Stearns Servs. Corp. v. Gredd., 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised larger returns for their investments. Initial investors are actually paid the promised returns, which attracts additional investors."). There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., at 8-10. See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS 280 75*63 (S.D.N.Y. 2010).

Deals"). Moreover, the Diamond Liquidation Deals purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

4. The second and more recent set of deals, involving significantly more funds, involved Mr. Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of Chase Manhattan Bank n/k/a JP Morgan Chase ("Chase"). Mr. Goldberg represented that he had a contractual right to purchase from Chase foreclosed business assets (such as structural steel, aluminum and other construction material) off a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals"). Mr. Goldberg represented to investors that his relationship with Chase was governed by a 1999 contract between Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

5. Mr. Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as Bechtel Corporation, United Technologies, Bausch and Lomb, Swinerton Builders and others. In most instances, the Chase Deals with investors provided a twenty percent (20%) rate of return per quarter.

6. In many of the Chase Deals, Mr. Goldberg, and not the investor, was responsible for paying any income tax owed by the <u>investor</u> on the profits generated.

7. Mr. Goldberg also represented to investors that the purported Chase Master Agreement contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to refund the full amount of the purchase price if the Debtors were unable to re-sell the acquired assets to the expected ultimate buyer.

8. Thus, many (but not all) of the investors in the Diamond Liquidation Deals and the Chase Deals were expecting to receive an annualized rate of return of over one-hundred percent (100%) on an after-tax basis, on virtually risk-free investments.

9. In stark contrast to the more complex fraudulent schemes unmasked in the recent wave of high-profile Ponzi schemes such as those perpetrated by Bernard Madoff, Manhattan Investment Fund Limited, Allen Stanford, Scott Rothstein, Mark Dreier and the Bayou Fund (to name a few), the Goldberg Scheme did not involve <u>any</u> legitimate, actual business or investment activity by the Debtors. All the funds used to pay investors came from other investors.

10. Mr. Goldberg has never been a licensed investment advisor. Mr. Goldberg has no financial training and was employed on a full-time basis as a medical device sales representative. In most instances, the Diamond Liquidation Deals and

4

Chase Asset Deals (which were often in the hundreds of thousands, and sometimes millions, of dollars) were evidenced only by one or two page contracts that appear to have been drafted by a layperson.

11. The Debtors' Diamond Liquidation Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds or sold anything to the purported "buyers". No "profits" or other income or proceeds were generated by any transactions involving the Debtors and all the funds received by investors went to either pay off other investors or for Mr. Goldberg's personal use or benefit.

12. The Debtors' supposed ability to "flip" diamonds quickly for a huge profit and unique relationship with Chase, as represented to investors, never existed and any such representations were fabricated, along with the sky-high rates of return, in order to bring investors to the table.

13. In short, the Goldberg Scheme was as purely illusory and uncomplicated as a Ponzi scheme can be. Virtually *every* dollar of the millions paid to the defendants and other investors who received money from the Goldberg Scheme came from other investors' cash; the money often simply electronically changing hands between account

holders in the same financial institutions (primarily Webster Bank and Bank of America) where Mr. Goldberg encouraged his investors to keep their accounts.

14. As word of these fantastic returns on virtually risk-free investments spread in the closely knit community of South Glastonbury (where Mr. Goldberg resided) throughout Connecticut and in other areas of the Nation, increasing numbers of investors wanted in on the Goldberg Scheme. The Debtors also, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme and took a percentage of the investment dollars they arranged ("Feeders").

15. This increased investment activity in the Goldberg Scheme derived in part from the Feeders' strong incentive to bring larger and larger deals to Goldberg given that they were risking other people's money while "earning" a 2% to 5% participation *plus*, in some instances, a finder's fee of up to ten percent (10%) on the investments made by their clients. The increased investments generated by the Feeders caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve over a hundred and thirty million dollars in transactions and ultimately resulted in hundreds of investors holding the bag for tens of millions in losses.

16. In mid to late 2009, more and more major investors began demanding full payment on their investments, instead of "rolling them over". At this point, the

Goldberg Scheme became more and more difficult to maintain. The Debtors began making later and later payments while they tried to find replacement investors to "take out" those investors who were demanding money. These increasingly late payments (although not totally uncommon) created concern among large investors who, for understandable reasons, feared the worst in terms of the <u>bona fides</u> of Mr. Goldberg's scheme. Consequently, these larger investors began putting Mr. Goldberg under more and more pressure and scrutiny.

17. Ultimately, Mr. Goldberg was sued and his assets were frozen by a group of large investors whose investments with the Debtors were not paid on maturity.

18. On or about November 16, 2009, Mr. Goldberg admitted to federal law enforcement officials that the Debtors had paid off the investments of existing investors with funds obtained from new investors.

19. On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtors.

20. On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

21. By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

22. On February 26, 2010, this Court entered an order consolidating these cases for joint administration only.

23. On various occasions since the Trustee's appointment, Mr. Goldberg has admitted to the Trustee and his representatives that the Goldberg Scheme was a pure Ponzi scheme as described above, that no legitimate investment activity was engaged in by him or Debtor LLC, and that every dollar used to make profits and principal payments to investors for at least the last ten years of the Goldberg Scheme came from other investors' money and not from any legitimate business activity or investment.

24. Richard and Diane Muscatello (the "Muscatellos") were investors in the Goldberg Scheme. The Muscatellos made certain investments and received certain payments in connection with the Goldberg Scheme as set forth on Exhibit A.

25. In summary, the Muscatellos received $26,000.00 more than they invested in the Goldberg Scheme. Of the $26,000.00 excess received by the Muscatellos, $18,000.00 was within the 90-day preference period as defined in 11 U.S.C. §547.

26. As set forth in the Settlement Agreement, although the Muscatellos were not aware that the Goldberg Scheme was a Ponzi Scheme, they were suspicious of the

outlandish returns and had concerns that the deal was "too good to be true." In fact, Mr. Muscatello attempted to terminate his investments in the Goldberg Scheme well prior to when he actually got out because he felt "it just wasn't right."

27. After interviewing Mr. Muscatello and informing the Muscatellos of the information set forth above, the Trustee and the Muscatellos have agreed, subject to Court approval, to compromise and settle the Trustee's claims against the Muscatellos as set forth in the Settlement Agreement attached hereto as Exhibit B. The essential terms of the Settlement are as follows:

    a. Within ten (10) days of the approval of the Settlement Agreement, the Muscatellos shall pay to the Trustee the sum of $56,000.00;

    b. The Trustee shall release the Muscatellos from any and all claims concerning their transactions with Goldberg;

    c. The Muscatellos shall retain an allowed unsecured claim against the Goldberg Estate in the amount of $30,000.00.

    d. In the event that the Trustee makes a blanket offer in the future to all investors similarly situated to the Muscatellos (i.e., to investors that had no actual knowledge that the Goldberg Scheme was a Ponzi scheme prior to the Petition Date; who did not receive any

compensation for bringing any other investors into the Goldberg Scheme and who had no relationship with Goldberg other than their investments in the Goldberg Scheme ("Innocent Investors")), to accept less than all false profits plus 30% of such Innocent Investors' capital investment in return for a release by the Trustee, then the Muscatellos shall be entitled to the same terms as those offered to Innocent Investors by the Trustee.

e. In the event that the Trustee makes an offer to Innocent Investors requiring a greater percentage disgorgement than paid by the Muscatellos or is otherwise ultimately entitled to recover from Innocent Investors more than their False Profits plus 30% of their capital investment in the Goldberg Scheme, the Muscatellos shall nevertheless *not* be required to pay any additional funds to the Trustee.

f. If any of the representations of the Muscatellos is determined to be materially false when made, the Muscatellos release shall be null and void and the Trustee shall be entitled to pursue the Muscatellos for any and all related claims.

28.     Courts should approve a settlement when it is "'both fair and equitable and in the best interests of the estate.'" Liu v. Silverman (In re Liu), No. 98-5027, 1998 U.S. App. LEXIS 31698, at *1 (2d. Cir. Dec. 18, 1998) (citing 10 Lawrence P. Kind, et al., Collier on Bankruptcy ¶ 9019.02 (15th ed. 1998)).  When making this determination, courts should consider: "(a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of creditors and a proper deference to their reasonable views in the premises." In re Marshall, 33 B.R. 42, 43 (Bankr. D. Conn. 1983). "The ultimate issue in such a matter is whether the proposed settlement falls below the lowest point in a range of reasonable settlements." In re Fairfield Lumber & Supply Co., 214 B.R. 441, 443 (Bankr. D. Conn. 1997) (citing Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d. Cir. 1983)).

29.     The Trustee respectfully submits that the proposed Settlement Agreement is in the best interests of these estates and their creditors. The Muscatellos are returning all of their false profits plus a percentage of their original investment that will hopefully prove greater than the percentage that the Trustee will ultimately need to recover from all investors in order to achieve a fair and equitable sharing by all investors of the economic

harm caused by the Goldberg scheme.

30. This settlement is well within the range of reasonableness necessary to justify this Court's approval, is in the best interest of the estate and should be approved. The payment to be made to the estate is a fair compromise of the Trustee's claim against the Muscatellos taking into consideration the amount recovered the amount at stake, the likelihood of success in the litigation, and the expense, inconvenience and delay necessarily attending it.

31. WHEREFORE, the Trustee respectfully requests that this Court enter the Order annexed hereto approving the compromise with the Muscatellos, and grant such other and further relief as it deems just and proper.

Dated this 22nd day of July, 2010.

JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE ESTATES OF MICHAEL S. GOLDBERG, L.L.C. AND MICHAEL S. GOLDBERG

By: /s/Jed Horwitt
Jed Horwitt (ct04778)
Zeisler & Zeisler, P.C.
558 Clinton Avenue
Bridgeport, CT 06605
Tel. 203-368-4234
Fax 203-367-9678
His Attorneys

G:\JB\G\Goldberg\Richard Muscatello Related\Motion to Approve Compromise.doc