**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MICHAEL S. GOLDBERG, LLC | ) | |
| MICHAEL S. GOLDBERG | ) | |
| Debtors. | ) | Case No. 09-23370 (ASD) |
| | ) | 09-23371 (ASD) |
| | ) | Jointly Administered Under |
| | | Case No. 09-23370 |

**MOTION TO APPROVE SETTLEMENT AGREEMENT**
**REGARDING PREFERENCE CLAIMS AGAINST KEVIN FOURNIER**

**BACKGROUND**

James Berman, Chapter 7 Trustee for the Estates of Michael S. Goldberg and

Michael S. Goldberg, LLC, by his undersigned counsel, hereby moves pursuant to Fed. R.

Bankr. P. 9019(a) for approval of the attached Settlement Stipulation and Order (the

"Stipulation/Order") with Kevin Fournier ("Fournier") and Nan Holdings, L.P. ("Nan"), and

in support thereof, represents the following:

1.      Over more than a decade, Michael S. Goldberg ("Mr. Goldberg") and

Michael S. Goldberg, LLC ("Debtor LLC") orchestrated a classic Ponzi Scheme (the

"Goldberg Scheme"). [1]

---

[1] A Ponzi scheme is a fraudulent pyramid-type scheme named after Charles Ponzi. <u>Cunningham v. Brown</u>, 265 U.S. 1 (1924).In such a scheme, money from new investors is used to pay artificially high returns to earlier investors in order to create an appearance of profitability and attract new investors so as to perpetuate the scheme. See <u>Bear Stearns Servs. Corp. v. Gredd.</u>, 397 B.R. 1, 8-10 (S.D.N.Y. 2007) (citing

2.     The Goldberg Scheme promised (and, for a long time, paid) unrealistically high rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter, in purportedly *risk-free* investments.

3.     Mr. Goldberg represented to investors that he and/or Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Mr. Goldberg represented that he could purchase diamonds, at extremely low wholesale prices, on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay the investor-holders of these purported diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Liquidation Deals"). Moreover, the Diamond Liquidation Deals purported to grant investors a security interest in the diamonds supposedly purchased for re-sale.

4.     The second and more recent set of deals, involving significantly more funds, involved Mr. Goldberg's representations to potential investors that he was one of

---

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 n. 3 (2d Cir. 1995)); see, also  In re: Unified Commercial Capital Inc. 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ("A Ponzi scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.  Typically, investors are promised larger returns for their investments.  Initial investors are actually paid the promised returns, which attracts additional investors.").  There is a general rule - known as the "Ponzi scheme presumption" - that such a scheme demonstrates fraudulent intent as matter of law because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." Bear Stearns v. Gredd., at 8-10.  See also Donnell v. Kowell, 533 F.2d 462, 770 (9th Cir. 2008), cert. den. 129 S.Ct. 640 (2008); SEC v. Resource Dev. Int'l, LLC, 487 F.3d 295, 304 (5th Cir. 2007); Armstrong v. Collins, 2010 Bankr. LEXIS 280 75*63 (S.D.N.Y. 2010).

2

a handful of "preferred vendors" of Chase Manhattan Bank n/k/a JP Morgan Chase ("Chase"). Mr. Goldberg represented that he had a contractual right to purchase from Chase foreclosed business assets (such as structural steel, aluminum and other construction material) off a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins of up to one hundred percent (100%) (the "Chase Asset Deals"). Mr. Goldberg represented to investors that his relationship with Chase was governed by a 1999 contract between Debtor LLC and Chase that had been updated from time-to-time (the "Chase Master Agreement").

5.      Mr. Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as Bechtel Corporation, United Technologies, Bausch and Lomb, Swinerton Builders and others.   In most instances, the Chase Deals with investors provided a twenty percent (20%) rate of return per quarter.

6.      In many of the Chase Deals, Mr. Goldberg, and not the investor, was responsible for paying any income tax owed by the investor on the profits generated.

7.      Mr. Goldberg also represented to investors that the purported Chase Master Agreement contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to refund the full amount of the purchase price if the Debtors were unable to re-sell the acquired assets to the expected ultimate buyer.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

8.      Thus, many (but not all) of the investors in the Diamond Liquidation

Deals and the Chase Deals were expecting to receive an annualized rate of return of over

one-hundred percent (100%) on an after-tax basis, on virtually risk-free investments.

9.      In stark contrast to the more complex financial machinations unmasked

in the recent wave of high-profile Ponzi schemes such as those perpetrated by Bernard

Madoff, Manhattan Investment Fund Limited, Allen Stanford, Scott Rothstein, Mark

Dreier and the Bayou Fund (to name a few), the Goldberg Scheme did not involve any

legitimate, actual business or investment activity by the Debtors.  All the funds used to

pay investors came from other investors.

10.     Mr. Goldberg has never been a licensed investment advisor.   Mr.

Goldberg has no financial training and was employed on a full-time basis as a medical

device sales representative. In most instances, the Diamond Liquidation Deals and

Chase Asset Deals (which were often in the hundreds of thousands, and sometimes

millions, of dollars) were evidenced only by one or two page contracts that appear to be

drafted by a lay person.

11.     The Debtors' Diamond Liquidation Deals and Chase Asset Deals were a

complete sham.  The Debtors never bought diamonds or foreclosed assets with investor

funds or sold anything to the purported "buyers".   No "profits" or other income or

proceeds were generated by any transactions involving the Debtors and all the funds

received by investors went to either pay off other investors or for Mr. Goldberg's

**ZEISLER & ZEISLER, P.C.** • *ATTORNEYS AT LAW*
558 CLINTON AVENUE • P. O. BOX 3186 • BRIDGEPORT, CONNECTICUT 06605-0186 • (203) 368-4234 • JURIS NO. 69625

personal use or benefit.

12.    The Debtors' supposed ability to "flip" diamonds quickly for a huge profit and unique relationship with Chase, as represented to investors, never existed and any such representations were fabricated, along with the high rates of return, in order to bring investors to the table.

13.    In short, virtually *every* dollar of the millions paid to the defendants and other investors who received money from the Goldberg Scheme came from other investors' cash; the money often simply electronically changing hands between account holders in the same financial institutions (primarily Webster Bank and Bank of America) where Mr. Goldberg encouraged his investors to keep their accounts.

14.    As word of these fantastic returns on virtually risk-free investments spread throughout Connecticut and in other areas of the Nation, increasing numbers of investors wanted to invest in the Goldberg Scheme.  The Debtors also, knowingly and unknowingly, began compensating individuals and companies who brought investors to the Goldberg Scheme and took a percentage of the investment dollars they arranged ("Feeders").

15.    This increased investment activity in the Goldberg Scheme derived in part from the Feeders' strong incentive to bring larger and larger deals to Goldberg given that they were risking other people's money while "earning" a 2% to 5% participation *plus*, in some instances, a finder's fee of up to ten percent (10%) on the

5

investments made by their clients.  The increased investments generated by the Feeders

caused the size of the Goldberg Scheme to explode between 2007 and 2009 to involve

over a hundred and thirty million dollars in transactions and ultimately resulted in

hundreds of investors holding the bag for tens of millions in losses.

16.     In mid to late 2009, more and more major investors began demanding

full payment on their investments, instead of "rolling them over".  At this point, the

Goldberg Scheme became more and more difficult to maintain.    The Debtors began

making later and later payments while they tried to find replacement investors to "take

out" those investors who were demanding money.  These increasingly late payments

(although not totally uncommon) created concern among large investors who, for

understandable reasons, feared the worst in terms of the bona fides of Mr. Goldberg's

scheme. Consequently, these larger investors began putting Mr. Goldberg under more

and more pressure and scrutiny.

17.     Ultimately, Mr. Goldberg was sued and his assets were frozen by a

group of large investors whose investments with the Debtors were not paid on maturity.

18.     On or about November 16, 2009, Mr. Goldberg admitted to federal law

enforcement officials that the Debtors had paid off the investments of existing investors

with funds obtained from new investors.

19.     On November 18, 2009 (the "Petition Date"), certain petitioning

creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

against the Debtors.

20.    On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

21.    By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

22.    On February 26, 2010, this Court entered an order consolidating these cases for joint administration only.

23.    On various occasions since the Trustee's appointment, Mr. Goldberg has admitted to the Trustee and his representatives that the Goldberg Scheme was a pure Ponzi scheme as described above, that no legitimate investment activity was engaged in by him or Debtor LLC, and that every dollar used to make profits and principal payments to investors for at least the last ten years of the Goldberg Scheme came from other investors' money and not from any legitimate business activity or investment.

24.    Fournier and Nan were investors in the Chase Asset Deals of the Goldberg Scheme. Fournier and Nan's financial transactions with the Debtors in connection with the Goldberg Scheme are set forth on Exhibit A.

25.    Fournier received $1,000,000 on October 13, 2009 and $1,900,000 on October 30, 2009 from the Goldberg Scheme within the 90-day preferenced period (the"Preferenced Account").    At the time, Fournier was owed $2,690,000.    On November 3, 2009, Fournier invested $600,000 into the Goldberg Scheme.    On

7

November 3, 2009, Nan invested $1,900,000 in the Goldberg Scheme. Fournier and Nan claim that Fournier is entitled to credit for Nan's $1,900,000 investment. The Trustee disagrees with Fournier and Nan's position.

26.     To resolve their disputes, Fournier, Nan, and the Trustee have agreed to the Settlement Agreement attached as Exhibit B. The essential terms of the Settlement are as follows:

## SUMMARY OF SETTLEMENT TERMS

27.     In summary, Fournier will pay the sum of $1,550,000 (the "Settlement Amount") for the benefit of the Debtors' estates. Fournier will have a claim against the estates for his returned principal in the amount of $1,550,000. The Settlement Amount, represents a fair settlement given the risks and costs of litigation, particularly since Fournier and Nan have already lost more than $3,000,000 in the Goldberg Scheme. Upon consummation of this settlement, Fournier shall have a total allowed claim in the amount of $1,850,000 and Nan shall have an allowed claim of $2,747,500 against the Debtor LLC.

28.     The Settlement Amount will be paid, in cash, by November 30, 2010.

## JURISDICTION AND VENUE

29.         This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

8

157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the

relief sought herein is Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.

## STANDARDS FOR SETTLEMENTS PURSUANT TO FED. R. BANKR. P. 9019(a)

30.   Fed. R. Bankr. P. 9019(a) provides that "on motion by the trustee and

after notice and a hearing, the bankruptcy court may approve a compromise or

settlement."[2] The Supreme Court has recognized that "in administering a reorganization

proceeding in an economical and practical matter, it will often be wise to arrange the

settlement of claims in which there are substantial and reasonable doubts." In re

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424-25, 88 S. Ct. 1157, 1163, 20 L. Ed. 2d 1, 9-10 (1968); see

also Motorola, Inc. v. Official Comm. of Unsecured Creditors, 478 F.3d 452, 462 (2d Cir.

N.Y. 2007) (noting that Courts in this Circuit evaluate settlement agreements pursuant to

the framework established by U.S. Supreme Court's decision in TMT Trailer Ferry). The

settlement of time-consuming and burdensome litigation, especially in the bankruptcy

context, is encouraged. In re Penn Central Transportation Co., 596 F.2d 1002 (3d Cir.

1979).

31.   Approval of a proposed settlement is within the "sound discretion" of

---

[2] A debtor-in-possession in a reorganization case has most of the rights of a trustee appointed under chapter
11 of the Bankruptcy Code. See 11 U.S.C. §§ 1106 and 1107.

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

the bankruptcy court.  In re Neshaminy Office Buildings Associates, 62 B.R. 798, 803

(E.D. Pa. 1986).  The court must determine whether the proposed settlement is in the

"best interests of the estate."  See Motorola, Inc., 478 F.3d at 465.

      32.      The bankruptcy court should consider five factors in striking the

balance between the value of the compromise and the value of the claim:  1) the

probability of success in the litigation; 2) the likely difficulties in collection; 3) the

complexity of the litigation; 4) the expense, inconvenience and delay necessarily

attending it; and, 5) the paramount interest of the creditors.  In re Drexel Burnham

Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088,

113 S. Ct. 1070, 122 L. Ed. 2d 497 (1993).  The court is not to decide the numerous

questions of law or fact raised by litigation, but rather should canvas the issues to see

whether the settlement falls below the lowest point in the range of reasonableness.  In re

W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983).

In addition, "because the bankruptcy judge is unequally situated to consider the equities

and reasonableness of a particular compromise, approval or denial of a compromise will

not be disturbed on appeal absent a clear abuse of discretion."  Neshaminy Office

Building Assocs., 62 B.R. at 803 citing, In re Patel, 43 B.R. 500, 505 (N.D. Ill. 1984).

      33.      Courts should approve a settlement when it is "'both fair and equitable

and in the best interests of the estate.'"  Liu v. Silverman (In re Liu), No. 98-5027, 1998

U.S. App. LEXIS 31698, at *1 (2d. Cir. Dec. 18, 1998) (citing 10 Lawrence P. Kind, et

ZEISLER & ZEISLER, P.C.  •  ATTORNEYS AT LAW
558 CLINTON AVENUE  •  P. O. BOX 3186  •  BRIDGEPORT, CONNECTICUT 06605-0186  •  (203) 368-4234  •  JURIS NO. 69625

al., Collier on Bankruptcy ¶ 9019.02 (15th ed. 1998)). "The ultimate issue in such a matter is whether the proposed settlement falls below the lowest point in a range of reasonable settlements." *In re* Fairfield Lumber & Supply Co., 214 B.R. 441, 443 (Bankr. D. Conn. 1997) (citing Cosoff v. Rodman (*In re* W.T. Grant Co.), 699 F.2d 599, 608 (2d. Cir. 1983)).

34.    The Trustee respectfully submits that the proposed Stipulation/Order is in the best interests of these estates and their creditors. Although the Trustee believes that he has a strong case against Fournier for the return of purported preference payments, there is risk associated with any litigation and there would certainly be substantial additional costs incurred by the estates if the Trustee has to bring his claims against Fournier. Here, the Settlement Amount represents a recovery of approximately 75% of the likely best-case scenario which will be received by the Trustee, and accomplishes it by November 30, 2010, rather than after protracted litigation.

35.    In light of the foregoing, this settlement is well within the range of reasonableness necessary to justify this Court's approval, is in the best interest of the estate and should be approved. The payment to be made to the estate is a fair compromise of the Trustee's claims against Fournier for preference payments taking into consideration the amount recovered relative to the amounts at stake, the likelihood of success in the litigation and the expense, inconvenience and delay necessarily attending it.

11

WHEREFORE, the Trustee respectfully requests that this Court enter the Order annexed hereto approving the compromise with Fournier and Nan and grant such other and further relief as it deems just and proper.

Dated this 2nd day of November, 2010.

> JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE
> ESTATES OF MICHAEL S. GOLDBERG, LLC AND
> MICHAEL S. GOLDBERG
>
> By: _____
>     Jeffrey Hellman (ct04102)
>     ZEISLER & ZEISLER, P.C..
>     558 Clinton Avenue
>     Bridgeport, CT 06605
>     (203) 368-4234
>     (203) 367-9678 fax
>     jhellman@zeislaw.com

12