**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

------------------------------------------------------X
In re:                                              :         Chapter 7
                                                    :
MICHAEL S. GOLDBERG, L.L.C.                         :         Case No. 09-23370 (ASD)
MICHAEL S. GOLDBERG                                 :         Case No. 09-23371 (ASD)
                                                    :
           Debtors                                  :         (Jointly Administered Under
                                                    :            Case No. 09-23370)
------------------------------------------------------X
                                                    :
JAMES BERMAN,                                       :         CONTESTED MATTER
CHAPTER 7 TRUSTEE:                                  :
                                                    :
           Movant                                   :
                                                    :
v.                                                  :
                                                    :
JP MORGAN CHASE & CO.                               :
                                                    :
           Respondent                               :         MAY 16, 2011

**MOTION FOR CONTEMPT FOR FAILURE TO RESPOND TO
<u>RULE 2004 EXAMINATION SUBPOENA AS TO JPMORGAN CHASE & CO.</u>**

  Pursuant to Fed. R. Bankr. P. 2004(c) and 9019, Fed. R. Civ. P. 45 and the Order of this Court (Doc. #351, the "Rule 2004 Examination Order") granting the motion for James Berman, Chapter 7 Trustee (the "Trustee") to take the examination of JP Morgan Chase & Co. ("Chase") pursuant to Fed. R. Bankr. P. 2004, the Trustee hereby moves the Court to enter an order of contempt against Chase for its failure and continuing refusal to comply with the Rule 2004 Examination Order and produce the documents subpoenaed in conjunction therewith.[1]

  For the reasons set forth below, the Trustee requests that: (1) the Court enter an order of contempt against Chase; (2) compel Chase to produce, without objection, all documents responsive to the 2004 Examination Subpoena by the Trustee within ten (10) days hereof; and

---

[1] A copy of the subject Subpoena Duces Tecum (the "2004 Examination Subpoena") is attached hereto as <u>Exhibit A</u>.

(3) order Chase to pay the attorneys fees of the Trustee in connection with this Motion. The Trustee further requests that the Court set a reasonable rate of reimbursement for Chase's compliance with the Trustee's 2004 Examination Subpoena and to fix the charges (i.e. search, review and copying costs) that Chase may request for complying with the 2004 Examination Subpoena.

## FACTS AND BACKGROUND

**A.    Procedural History**

1. On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against Michael S. Goldberg, LLC (the "LLC") and the LLC's sole member, Michael S. Goldberg ("Goldberg"). The LLC and Goldberg are collectively referred to herein as the "Debtors".

2. On November 24, 2009, the Court entered the Order for Relief in the Debtors' cases.

3. By Orders dated January 11, 2010, the Court confirmed the election of James Berman as Chapter 7 Trustee in both cases.

4. On February 26, 2010 this Court entered an order consolidating these cases for joint administration only.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. As its sole member, Goldberg used the LLC to perpetrate a substantial "Ponzi scheme" type fraud (the "Goldberg Scheme") for over ten (10) years against hundreds of investors who hold combined claims against the Debtors in excess of $25 million dollars.

7. The Trustee is charged with, among other things, investigating the financial affairs of the Debtors, including the Goldberg Scheme, and collecting and reducing to money the property of the Debtors' estates and distributing such money to creditors in accordance with the Bankruptcy Code.

**B.  Factual Background**

    **1.  The Goldberg Scheme**

8. Mr. Goldberg perpetrated the Goldberg Scheme over many years, until November 17, 2009, when Mr. Goldberg admitted his fraudulent actions and turned himself in to the authorities. Mr. Goldberg used his single member LLC, which did business as "Acquisitions Unlimited Group" to facilitate his fraud.

9. The Goldberg Scheme promised (and, for a long time, paid) patently unbelievable rates of return of up to (and in some instances exceeding) twenty percent (20%) per quarter, in purportedly *tax free and risk-free* investments.

10. Mr. Goldberg represented to investors that he and/or Debtor LLC were engaged in primarily two types of business deals that generated these fantastic returns. First, in the early years of the Goldberg Scheme (but continuing throughout), Mr. Goldberg represented that he could purchase diamonds, at extremely low wholesale prices, on the New York City diamond exchange and resell those diamonds for a profit sufficient to pay the investor-holders of these purported diamond liquidation contracts, a twenty percent (20%) rate of return every sixty (60) days (the "Diamond Liquidation Deals").

11. The second and more recent set of deals, involving significantly more funds, involved Mr. Goldberg's representations to potential investors that he was one of a handful of "preferred vendors" of Chase Manhattan Bank n/k/a JPMorgan Chase & Co.

3

12. Mr. Goldberg represented that he had a contractual right to purchase, from Chase, foreclosed business assets (such as structural steel, aluminum and other construction material) from a "Chase Foreclosure Manifest" at prices low enough to allow him to re-sell those assets (usually within ninety (90) days of purchase) to large institutions at profit margins up to one hundred percent (100%) (the "Chase Asset Deals").

13. Mr. Goldberg represented to investors that his relationship with Chase was governed by a 1999 contract between the Debtors and Chase that had been updated from time-to-time (the "Chase Master Agreement").

14. Mr. Goldberg represented to investors that the Chase Asset Deals involved pre-arranged sales to major public companies such as Bechtel Corporation, United Technologies, Bausch and Lomb, Swinerton Builders and others.

15. In most instances, the Debtors' contracts with investors in the Chase Asset Deals ("Chase Contracts") provided a twenty percent (20%) rate of return per quarter.

16. Mr. Goldberg also represented to investors that the purported Chase Master Agreement contained a "Contract Dissolution Capital Protection Clause" which obligated Chase to refund the full amount of the purchase price if the Debtors were unable to re-sell the acquired assets to the expected ultimate buyer.

17. Thus, many (but not all) of the investors in the Diamond Liquidation Contracts and the Chase Contracts were expecting to receive an annualized rate of return of over one-hundred percent (100%) on an after-tax basis, in risk-free deals.

18. Both the Diamond Liquidation Deals and Chase Asset Deals were a complete sham. The Debtors never bought diamonds or foreclosed assets with investor funds or, sold anything to the purported "buyers". No "profits" or other income or proceeds were generated by

any transactions involving the Debtors and all the funds received by investors went to either pay off other investors or for Mr. Goldberg's personal use or benefit.

19.     The Debtors' supposed ability to buy and sell assets, quickly, at a huge profit because of Goldberg's unique relationship with Chase, as represented to investors, never existed and any such representations made to obtain investments in the Goldberg Scheme were designed, along with the patently unreasonably high rates of return, to induce investors to invest money in the fictitious Diamond Deals and the Chase Asset Deals.

20.     In short, the Goldberg Scheme was as purely illusory and uncomplicated as a Ponzi scheme can be.  Virtually *every* dollar of the millions paid to the defendants and other investors who received money from the Goldberg Scheme came from other investors' cash. Indeed, the money often simply electronically changing hands between account holders in the same financial institutions where Mr. Goldberg encouraged his investors to keep their accounts. Thus, the Goldberg Scheme was a "pure" Ponzi scheme.

**2.      Mr. Goldberg's Relationship with Chase**

21.     For many years Mr. Goldberg claimed to have a business relationship with Chase as evidenced by the Chase Asset Deals, which formed the foundation of the Goldberg Scheme.

22.     In mid to late 2008, Mr. Goldberg began working with a large group of investors in Florida.  These investors asked more questions concerning the Goldberg Scheme than previous investors.  Accordingly, to facilitate his transactions with the Florida investors, Mr. Goldberg opened actual bank accounts at Chase by depositing a large amount of money with Chase.

23.     Between October 2008 and May 2009, during one of the most active periods of the Goldberg Scheme, more than $17 million passed through the LLC's accounts at Chase.

24. Chase assisted Mr. Goldberg in perpetrating his Ponzi scheme in that one or more of its employees allowed Mr. Goldberg to use office space at a Chase branch in New York City to meet with current and/or prospective investors on at least two occasions.

25. Mr. Goldberg specifically sought, and received, permission from Chase employees to use its conference and office facilities without any Chase employee overseeing Mr. Goldberg's activities while at the Chase branch. By permitting Mr. Goldberg to use its offices, totally unsupervised, Chase afforded Goldberg the opportunity to have his present and/or future investors meet at least one individual who impersonated high-ranking Chase employees for the purpose of "proving" that Chase did, indeed, sell foreclosed assets to the Debtors according to the terms and conditions described by Mr. Goldberg.

26. For example, in response to a demand by certain investors from Florida for a meeting with Chase, Goldberg arranged a meeting with "Chase" on May 12, 2009. Some of the Florida investors met with Goldberg at a Chase branch in New York City, along with a woman who introduced herself as "Julia Bates," a Chase official. This person was, in fact, Christine Woods, a friend of Goldberg. Ms. Woods was not, and never had been, employed by Chase. Upon information and belief, the real Julia Bates serves as Chase's director for Investor Relations.

27. Upon information and belief, following the May 12, 2009 meeting, an attorney for some of the Florida investors communicated with the *real* Julia Bates a high-ranking employee of Chase and attempted to speak with her about their prior meeting. Upon information and belief, Ms. Bates denied attending such a meeting.

**3.     The Goldberg Scheme Collapses**

6

28. Ultimately, Mr. Goldberg was sued and his assets were frozen by a group of large investors whose investments with the Debtors were not returned when due. At that point, Mr. Goldberg turned himself in to federal authorities. At about the same time, those investors who had sued the Debtors for fraud joined together to commence the involuntary bankruptcies which resulted in the Trustee's appointment, and in which capacity he brings this action for the benefit of all creditors of the estate.

29. On or about November 16, 2009, Mr. Goldberg admitted to federal law enforcement officials that the Debtors had paid off the investments of existing investors with funds obtained from new investors.

30. By a Plea Agreement, dated September 13, 2010 entered in the case styled *United States v. Michael S. Goldberg*, Docket No. 3:10-cr-192 (JCH) (Doc. #31), Mr. Goldberg admitted that he had engaged in a pure Ponzi scheme and that there was no underlying business of any sort with respect to the Goldberg Scheme. (Goldberg Plea Agreement, Exhibit B.)

**4. The Trustee is Entitled to Investigate the Relationship Between Chase and Mr. Goldberg**

31. In order to investigate the relationship between Chase and the Debtors, the Trustee obtained this Court's permission to conduct a Rule 2004 examination of Chase. In accordance with the Rule 2004 Examination Order, the Trustee served Chase with a subpoena duces tecum to produce documents related to the Debtors' relationship with Chase. Chase was ordered to produce the requested documents on February 11, 2011 and to appear for a deposition on February 16, 2011.[2]

32. The 2004 Examination Subpoena was served January 19, 2011.

---

[2] The Trustee also faxed a copy of the 2004 Examination Subpoena to Chase's national subpoena office contemporaneous with the service by Connecticut State Marshall.

7

33. Chase never objected to any specific document request or the oral examination and has filed no papers, whatsoever, objecting to the Trustee's subpoena.

34. On February 9, 2011, the day before document compliance was due, a representative of Chase telephoned counsel for the Trustee to request additional time to comply with the 2004 Examination Subpoena. The Trustee granted this request.

35. Approximately one month later, in mid-March 2011, Trustee's counsel was contacted by Andrea Weiss, Esq., an attorney for Chase, who asked the Trustee to provide certain descriptive words or phrases so that Chase could begin its search for the subpoenaed documents.

36. At this time the undersigned advised Attorney Weiss that even through the time for compliance had long since passed, the Trustee would attempt to provide the information requested so as to facilitate Chase's compliance with the 2004 Examination or Subpoena.

37. By email correspondence, dated April 7, 2011, Trustee's counsel provided the requested information and asked Chase to state the anticipated cost of production. (4/7/2011 Sklarz Email, Exhibit C.)

38. After several more discussions, on May 2, 2011 – nearly three months after compliance was originally due – Attorney Weiss informed the Trustee that Chase did not know what documents it had, had not attempted to ascertain if it had any responsive documents, could not provide any reasonable estimate of cost (stating only that compliance with the 2004 Examination Subpoena may cost the Estate as much as $12,500 *plus* attorney review fees) and refused to search for potentially responsive documents involving Julia Bates, including, most significantly, any emails between the Florida investors and the real Julia Bates. (5/2/2011 Weiss Email, Exhibit D.)

39. Accordingly, the Trustee requires court intervention to secure the requested documents from Chase and a deposition of Chase.

8

## LAW AND ARGUMENT

### A. Motions for Contempt Generally

40. Fed. R. Bankr. P. 2004 allows the court, on motion of any party in interest, to order the examination of any entity if such examination relates "to the acts, conduct, or property or to the liabilities and financial condition of the debtor's estate…." "The purpose of such a broad discovery tool is to assist the trustee in revealing the nature and extent of the estate; ascertaining assets; and discovering whether any wrongdoing has occurred." In re: Corso, 328 B.R. 375, 383 (E.D.N.Y. 2005).

41. "To safeguard against abuses of discovery and/or to protect against an overbroad subpoena, the Federal Rules of Civil Procedure provide a level of protection for subpoenaed persons. In that regard, *Rule 45(c)*, entitled "Protection for Persons Subject to Subpoenas," states in relevant part:

> (c)(2)(B) . . . a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection and copying of any or all of the designated materials or the premises.

Id.

42. Chase never served a written objection to the Trustee's 2004 Examination Subpoena. Instead, Chase affirmatively indicated a willingness to comply with the Subpoena, but then, failed to respond and appears to now be resisting production of the requested documents without reason.

43. Fed. R. Civ. P. 45(e) of the Federal Rules of Civil Procedure provides that "failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued." Id.

44. Bankruptcy Courts, like all other courts, have the inherent power to enter civil contempt orders. In re Chief Exec. Officers Clubs, Inc., 359 B.R. 527, 533-534 (Bankr. S.D.N.Y. 2007); Fed. R. Bankr. P. 9020 (providing that a motion for an order of contempt is governed by Fed. R. Bankr. P. 9014).

45. Bankruptcy Courts also possess the statutory contempt power conferred by Bankruptcy Code § 105(a). In re: Kalikow, 2010 U.S. App. Lexis 7247, at 36 ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders.") (citations omitted); Bessette v. Avco Financial Servs., 230 F.3d 439, 445 (2d Cir. 2000) (citations omitted). Section 105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

46. The purpose of civil contempt is "to coerce the contemnor into compliance with the court's order and/or to compensate the complaining party for losses incurred as a result of the contemnor's conduct." S.D. Prot. V. Del. Rio, 587 F. Supp. 2d 429, 433 (E.D.N.Y. 2008) (citing United States v. United Mine Workers, 330 U.S. 258, 298-99, 67 S. Ct. 677, 91 L.Ed. 884 (1947)).

**B.    The Court Should Hold Chase in Contempt for Failing to Respond
       To the Trustee's 2004 Examination Subpoena**

47. The time long passed for Chase to have complied with the Trustee's 2004 Examination Subpoena. Chase should have responded to the 2004 Examination Subpoena or, alternatively, sought an appropriate protective order. Chase did neither. Further, despite the

Trustee's attempt to work with Chase in order to facilitate the production of documents, including providing key words for searches, Chase has produced nothing.

48.     Instead, Chase has responded only that (a) it does not know whether any responsive documents exist and (b) a search may cost the Estate as much as $12,500.  This response is totally inadequate.  Chase was one of the banks Mr. Goldberg used to facilitate his fraud.  Mr. Goldberg premised his fraud on his special relationship with Chase.  Indeed, he even used an office or conference facilities at Chase to convince investors that Chase was actually involved in the Debtor's business of buying and selling foreclosed assets.  Accordingly, the Trustee is entitled to explore the relationship between Mr. Goldberg and Chase.

49.     Further, Chase has explicitly stated that it will not search for documents concerning "Julia Bates," even though:  (a) Mr. Goldberg had his friend, Christine Woods, impersonate Ms. Bates during a meeting *at a Chase branch* to further the Goldberg Scheme and (b) Ms. Bates actually spoke with counsel to current and prospective investors who had indicated that he had previously met with her.  If the real Julia Bates had any communications with Mr. Goldberg, or anyone involved in the Goldberg Scheme, such information would be relevant concerning Chase's knowledge of the Goldberg Scheme and any active role, if any, it played in facilitating the Goldberg Scheme.

50.     Finally, Chase waived its right to object to the 2004 Examination Subpoena by not filing an appropriate motion prior to February 10, 2011, or at anytime thereafter.  Accordingly, Chase has no valid basis to withhold any of the documents sought.

51.     The Court should hold Chase in contempt for its blatant and unreasonable disregard of the 2004 Examination Subpoena.

**C.     The Court Should Set a Reasonable Rate of Reimbursement for Chase's Production of Documents and Fine Chase for Failing to Respond to the 2004 Examination Subpoena**

52. Chase claims that it may charge the estate as much as $12,500 to perform a search of documents to comply with the 2004 Examination Subpoena. Such a rate is unreasonably high and appears arbitrary, at best. Accordingly, the Court should establish a reasonable rate of reimbursement commensurate with the actual cost Chase incurs in compliance with the 2004 Examination Subpoena. See, 1991 Advisory Committee Note to Fed. R. Civ. P. 45(c)(2)(B) (non-party entitled to reasonable reimbursement for compliance with subpoena).

53. "Protection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance.'" Linder v. Calero-Portcarrero, 180 F.R.D. 168, 177 (D.D.C. 1998) (quoting In re Exxon Valdez, 142 F.R.D. 380, 383 (D.D.C. 1982). In Exxon the court explained that there is no indication that the chapters of revised Rule 45 intended to overrule prior Rule 45 case law under which a nonparty can be required to bear some or all of its expenses where the equities of a particular case demand it." Id. Factors courts look at to determine whether a nonparty is entitled to reimbursement of the costs of complying with a subpoena include: "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public importance." In re Exxon Valdez, 142 F.R.D. at 383 (internal citations omitted).

54. Here, Chase has not provided the Trustee any reason why $12,500 is a reasonable reimbursement. Chase has only stated the cost is "$500 per custodian per month" for archived material. However, Chase has not explained why this is the charge.

55. Further, Chase is a large financial institution that regularly produces information in litigation. The Trustee is seeking to recover funds for victims of the Goldberg Scheme and any funds expended to obtain documents from Chase will not be available for payment to victims of the

Goldberg Scheme. Moreover, given that the Trustee is investigating possible claims against Chase, Chase should reasonably be expected to pay its own expenses regarding production of document. As held in Exxon, where a third-party has an incentive to withhold documents to avoid potential liability, it is proper to shift the cost of production to the third-party.

56. Here, it was Chase employees who permitted Mr. Goldberg to use Chase's offices for at least two meetings between an imposter posing as Julia Bates, the Florida investors. The Trustee, thus, is required to investigate Chase's relationship of Mr. Goldberg and its involvement in the Goldberg Scheme to determine whether the estate has a potential claim against Chase

57. Accordingly, the Court should order that Chase is entitled to reasonable copying costs of $0.05 per page for documents actually copied and produced, regardless of whether the documents are archived or not.

58. Given that Chase has failed to produce any documents and essentially disregarded the 2004 Examination Subpoena, the Court should order that Chase not charge the Trustee for the actual searches performed or a review of the records.

59. Further, the Court should order that Chase must specify precisely how much it is going to charge the Trustee for copying costs ahead of time.

60. Finally, the Court should fine Chase $1,500.00 to reimburse the Trustee for the cost associated with the filing of this Motion, and issue an Order requiring Chase to reimburse legal fees incurred by the Trustee in drafting and prosecuting this motion.

**WHEREFORE**, the Trustee respectfully requests that the Court grant the relief requested herein and such other and further relief as may be just and proper including: (a) compelling Chase to respond fully to the 2004 Examination Subpoena; (b) setting a reasonable charge for Chase's compliance with the 2004 Examination Subpoena; and (c) fining Chase for failing to comply with the 2004 Examination Subpoena.

                                                                            JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE ESTATES OF MICHAEL S. GOLDBERG, L.L.C. AND MICHAEL S. GOLDBERG

By: /s/ Jeffrey M. Sklarz
     Jeffrey M. Sklarz (ct20938)
     Zeisler & Zeisler, P.C.
     558 Clinton Avenue
     Bridgeport, CT 06605
     Tel. 203-368-4234
     Fax 203-367-9678
     Email: jsklarz@zeislaw.com