**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

|  |  |
|---|---|
| In re: | : Chapter 7 <br> : <br> : |
| MICHAEL S. GOLDBERG, LLC, and <br> MICHAEL S. GOLDBERG, | : Case No. 09-23370 (JAM) <br> : Substantively Consolidated <br> : |
| Debtors. | : <br> : <br> : |

# CHAPTER 7 TRUSTEE'S STATUS REPORT

Pursuant to the Order Setting Date for Filing of Status Report and Scheduling Status Conference (Doc. No. 1591), (the "Status Report Order"), James Berman, Chapter 7 Trustee (the "Trustee") for the substantively consolidated bankruptcy estate (the "Estate") of Michael S. Goldberg, LLC ("LLC") and Michael S. Goldberg ("Mr. Goldberg", and together with LLC, the "Debtors"), by and through his undersigned counsel submits the following status report:

**I.    General Background of Case**

    **A.  The Trustee's Appointment and Recovery on Behalf of the Estate**

The Debtors' now substantively consolidated bankruptcy cases (the "Bankruptcy Case") were commenced as involuntary Chapter 7 cases pursuant to petitions filed against the Debtors on November 18, 2009, by a group of creditors who collectively were owed over $12 million in principal and who had sued Mr. Goldberg in state court for fraud arising out of what has now been admitted and determined to be a classic and pure Ponzi scheme with no legitimate business activity whatsoever (the "Goldberg Scheme"). Mr. Goldberg admitted this in his Plea Agreement which the District Court accepted and incorporated in its Judgment and Order of Restitution in the Criminal Case (defined below) arising out of the Goldberg Scheme. The Debtors consented to the entry of orders for relief in the Bankruptcy Court on November 24, 2009. This Court

1

confirmed the Trustee's election on January 11, 2010, and the United States Trustee ("UST") appointed the Trustee on January 12, 2010. The Trustee filed a Motion to Retain Zeisler & Zeisler, P.C. ("Z&Z") on January 14, 2010, and the order authorizing Z&Z's retention entered on January 22, 2010, nunc pro tunc to January 7, 2010.

Since his appointment and the employment of Z&Z, the Trustee has commenced approximately 200 adversary proceedings and other civil actions to recover property to compensate the victim/creditors of the Goldberg Scheme. The Trustee has successfully resolved through settlement or judgment the vast majority of these adversary proceedings. The Estate had no money in it when the Trustee commenced his duties. In total, the Trustee has recovered approximately $19,213,869.82 for the Estate since his appointment. The Trustee obtained the vast majority of this recovery through prosecuting the adversary proceedings, with a total recovery of $18,428,716.34 from such litigation through settlement or collection of judgments.

### B. The Trustee Is Also the Receiver for Criminal Restitution

In addition to being the Trustee of the Estate, because of the virtual identify of the creditors in the bankruptcy case and the victims of the Goldberg Scheme, the Assistant United States Attorney asked and the Trustee agreed to serve as temporary receiver (the "Receiver") for criminal restitution ("Restitution") in Mr. Goldberg's criminal case, United States of America v. Michael S. Goldberg, Crim. Pro. No. 3:10-cr-192 (RNC) (the "Criminal Case"). On May 19, 2011, pursuant to a motion filed by the United States Attorney, the Hon. Robert A. Chatigny, entered the Order Appointing Receiver (the "Receiver Order"),[1] appointing Mr. Berman as the temporary receiver in the Criminal Case. (Criminal Case, Doc. No. 51.) Judge Chatigny's order states, inter alia, that the creditors of the Estate "are almost wholly identical to the victims in the criminal case." (Receiver Order, p.1.)

---

[1] The Receiver Order was contingent on a mirroring order from the Bankruptcy Court. (Receivership Order, ¶ 18.) The Trustee obtained such approval by an Order from this Court dated June 16, 2011. (Doc. No. 462.)

2

The Receiver Order recognizes and establishes that funds collected and distributed by the Trustee to creditor-victims directly impacts the Restitution owed to victims in the Criminal case dollar for dollar:

> The Court acknowledges that such Bankruptcy litigation is likely to continue well beyond the defendant's sentencing in this matter; that bankruptcy proceedings will continually readjust both the amounts of losses and the identities of victims; and therefore that it would be impracticable to require the Clerk's Office or the Probation Office continually to account for such changes and adjust the defendant's restitution obligation accordingly.

(Receiver Order, p.2.) Moreover, the Receiver Order requires the Receiver, after the termination of these bankruptcy proceedings and any Receivership litigation, to provide a final report establishing the final identify of all victims (*i.e.*, individuals who have not been paid Restitution in full through distributions in the Bankruptcy Case by the Trustee or by the Receiver); the amount of Restitution still owed to such victims; the funds then held for Restitution and the Receiver's proposal for distributing those funds as Restitution to such victims.

Thus, the Receiver Order recognizes that all funds recovered by the Trustee and distributed to creditors in the Bankruptcy Case offset, dollar for dollar, Restitution owed to victims in the Criminal Case. While cash Receivership Assets are held separately from the assets of the Estate, it is clear that all property of the Estate other than cash are assets of the Receivership. (Receiver Order, at 3 (providing that "'Receivership Assets shall be defined as all monies, securities, claims in action, and properties, real and personal, tangible and intangible, of whatever kind and description, wherever situated that are collected or collectible by Berman for the purpose of paying restitution to victims according to this Order.")) Thus, any economic harm to the Estate caused by conduct which could be prosecuted by the Receiver and the Trustee harms both this Estate and the Receivership.

### C. The Trustee's Collection Efforts

The Trustee and his counsel identified the Estate's largest cause of action within months of his appointment and commenced an adversary proceeding in May 2010, which eventually named over twenty defendants. This adversary proceeding was captioned <u>James Berman, Chapter 7 Trustee v. Michael S. Goldberg, LLC et al.</u>, Adv. Pro. No. 10-02082 (Bankr. D. Conn.) (the "<u>2082 Adversary Proceeding</u>"). The 2082 Adversary Proceeding sought the return of intentionally fraudulent and preferential transfers received by the defendants from the Debtors. As initially commenced in May 2010, the 2082 Adversary Proceeding did not include Scott LaBonte because the Trustee had yet to sufficiently determine that he was both a transferee from and a feeder to the Goldberg Scheme. On October 21, 2010, the Trustee filed a Motion to (1) Cite in Additional Defendants and (2) Amend the Complaint, both of which the Court granted on November 2, 2010. (2082 Adversary Proceeding, ECF No. 84). The Trustee filed the Amended Complaint (2082 Adversary Proceeding, ECF No. 94) (the "<u>Amended Complaint</u>"), naming Scott LaBonte as a defendant, on November 12, 2010. Shockingly, prior to the Trustee adding Scott LaBonte and certain of his controlled entities as defendants in the 2082 Adversary Proceeding, Scott LaBonte, members of the LaBonte family, certain LaBonte family business associates, and their professionals (collectively, the "<u>Putative RICO Defendants</u>") met in June of 2010 to begin implementing a scheme to render Scott LaBonte, and his family's real estate business, judgment proof from the clawback claims they knew would be brought by the Trustee. The 2082 Adversary Proceeding was tried before the Bankruptcy Court in June of 2011 and was decision-ready in November of 2011.

The Bankruptcy Court entered its Amended Proposed Findings of Facts and Conclusions of Law (the "<u>Proposed Findings</u>") in the 2082 Adversary Proceeding on May 11, 2015. (2082

4

Adversary Proceeding, ECF No. 726.) On September 27, 2017, the United States District Court for the District of Connecticut adopted, virtually in *toto*, the Bankruptcy Court's Proposed Findings and entered judgment (ECF No. 815) (the "Judgment") in favor of the Trustee against, *inter alia*, Scott LaBonte in the amount of $7,241,797.52 and certain of his family owned and/or managed commercial real estate related limited liability companies in various amounts with prejudgment interest. The vast majority of the Judgment remains unpaid today.

Substantially simultaneously with preparing for and prosecuting the 2082 Adversary Proceeding, the Trustee commenced the second largest adversary proceeding in the Bankruptcy Case (the "AUG Action"). The AUG Action sought the recovery of approximately $9 million of fraudulently conveyed funds from a group of over fifty (50) defendants, who were primarily based in Florida and had invested in the Goldberg Scheme through an individual named Bob Stein and his entity called AUG, LLC. In August 2012, the Trustee mediated over three (3) days these significant claims and reached a negotiated settlement with a value of approximately $7 million, including over $5.2 million in cash and $2 million in allowable claims waivers.

By the end of 2012, in the wake of the successful settlement of the AUG Action and recovery on dozens of smaller clawback actions, the Trustee had accumulated sufficient funds to make a 27.5% distribution to creditor-victims in the amount of $8,354,651.01. This distribution was made without the benefit of recovering any distributable funds from the 2082 Adversary Proceeding defendants.

As of the date of this Status Report, the Trustee has recovered for the benefit of the Estate and the Receivership $19,213,869.82.

**D. The Frustration of the Trustee's Efforts to Preserve and Recover the 2082 Adversary Proceeding Judgment Against Scott LaBonte and Related Defendants**

After almost ten (10) years of pursuing and distributing property of the Estate and the Receivership, the only remaining avenue to provide a further meaningful distribution to creditor-victims is the claim that arises from the Putative RICO Defendants' thus far successful and illegal frustration of the Trustee and the Receiver's efforts to collect upon the Judgment.[2] For the past nine (9) years, the Putative RICO Defendants have engaged in and facilitated a series of intentional fraudulent conveyances and other illegal acts designed to totally obstruct the Trustee and Receiver from collecting on the Judgment. These actions have effectively denuded Scott LaBonte, his dominated and controlled entities and trusts, and other LaBonte family real estate business related entities of assets that could have satisfied the Judgment. As this Court is aware, the Trustee was forced to commence no less than three additional adversary proceedings *pending the entry of the Judgment in 2017* solely for the purpose of preserving the Estate's ability to recover the Judgment. Nevertheless, all of these fraudulent conveyance actions have become worthless by virtue of the Putative RICO Defendants continuing racketeering activity.

The first such prophylactic action, Berman, Trustee v. Sally LaBonte, et al., Case No. Civ 3:15-cv-01687 (AWT) (the "Dynasty Trust Action"), was commenced on May 30, 2014, as adversary proceeding no. 14-02026.[3] The Trustee next commenced an action in May of 2016 captioned Berman, Trustee v. Landino et al., Adv. Pro. No. 16-02042 (the "Landino Adversary") to avoid and recover the intentional fraudulent transfers by Scott LaBonte of certain of his dominated and controlled entities to Landino and Landino-solely-owned entities. Finally, in June 2017, the Trustee commenced an action captioned Berman, Trustee v. DEI Property Management, et al., Adv. Pro. No. 17-02029 (the "DEIPM Adversary" and collectively with the

---

[2] In fact, as will become evident below, the Putative RICO Defendants have already rendered the Estate illiquid to the point that the only fee arrangement through which they can be prosecuted by the Trustee and the Receiver is some form of voluntary contingency fee structure.
[3] The reference was withdrawn and the case transferred to the district court by order dated September 26, 2016.

Dynasty Trust Action and the Landino Adversary, the "LaBonte Collection Actions"), seeking to avoid and recover yet another intentional fraudulent transfer engineered and/or facilitated by certain of the Putative RICO Defendants.

### E. The Trustee's Investigation of Potential RICO Claims Against the Putative RICO Defendants[4]

In December of 2017, the Trustee filed a motion before the Hon. Alvin W. Thompson, (U.S.D.J.) seeking otherwise privileged communications between and/or among the Putative RICO Defendants under, *inter alia*, the crime-fraud exception to the attorney-client privilege (the "Privilege"). Based upon the evidence provided by the Trustee in support of the motion, Judge Thompson found probable cause that a fraud had occurred in connection with Scott LaBonte's interactions with and use of his lawyers and accountants to effectuate a series of intentional fraudulent conveyances:

> [T]he court concludes that the materials that have been withheld [as privileged] are discoverable under the crime-fraud exception to the attorney-client privilege. The record here contains evidence sufficient to establish probable cause to believe that a fraud was committed and that the communications at issue [those between and among Scott LaBonte, Sally, Paul Bourdeau, Esq. ("Bourdeau"), and Joseph W. Sparveri, CPA ("Sparveri")] were in furtherance of that fraud, notwithstanding the explanations proffered by the defendants.

Berman, Trustee v. Sally LaBonte, et al., Case No. Civ 3:15-cv-01687 (AWT), Ruling on Motion to Compel and Motions to Quash Subpoenas (the "Crime-Fraud Order"), Doc. No. 75, at p.8.[5] *See also*, *id.*, at p.15 ("there is probable cause to believe that the documents and communications at issue here were in furtherance of a transfer of assets made by [Scott LaBonte] with actual fraudulent intent"). The evidence supporting probable cause of the existence of a fraud was so substantial that Judge Thompson did not even address the other non-fraud-based grounds the

---

[4] The Trustee has obtained extensive evidence to support the RICO Claims. The Trustee does not intend this section to be exhaustive, but rather, it includes some of the most salient evidence obtained by the Trustee to date.

[5] For the Court's convenience a copy of the Crime-Fraud Order is attached hereto as **Exhibit A**.

Trustee proffered as bases to compel production of the materials claimed to be privileged. *Id.*, at p.15.

Following the issuance of the Crime-Fraud Order the Trustee took a series of depositions and obtained previously withheld documents including communications between Scott LaBonte and his professionals which comprise irrefutable evidence, including sworn admissions, establishing the Putative RICO Defendants' illegal actions. This evidence established, among other things:

a. A meeting between certain of the Putative RICO Defendants ("The Initial RICO Meeting") was held within days of Scott LaBonte learning that the Trustee had sued his cousin, Edward Malley, through whom he invested in the Goldberg Scheme, to recover fraudulent transfers Malley received from the Debtors.

b. Contrary to what Scott LaBonte has testified to under oath on multiple occasions, the true purpose of the asset transfers to the Scott A. LaBonte Dynasty Trust ("SALDT") following the Initial RICO Meeting was to insulate Scott LaBonte's assets from the Trustee, while continuing to allow him to exclusively manage, control, and enjoy the benefits of those same assets. Indeed, Bourdeau's notes from the Initial RICO Meeting, a copy of which is attached here to as **Exhibit B**, reference a "claw back" by a "Hartford Trustee," as well as a reference to Scott LaBonte transferring his assets to the SALDT among other compromising facts.

c. Both Bourdeau and Sparveri testified that the purpose of the RICO Meeting was to place Scott LaBonte's assets beyond the reach of the Trustee. Bourdeau testified in October of 2018:

> Q. The whole purpose of this meeting was to determine what Scott should do going forward, based on the fact that Ed Malley had

8

> been sued by the Trustee and Scott had invested in the Goldberg Ponzi scheme through Ed Malley; right?
> A. Correct.

Likewise, Sparveri testified in November of 2018:

> Q. … the purpose of [the Initial RICO Meeting] was to discuss putting Scott LaBonte's assets in the dynasty trust so that they would not be recoverable by the trustee; right?
> …
> A. Yes.

d. Bourdeau deleted all LaBonte family-related emails, claiming it as his "business practice" to print out emails and delete the electronic copy. Bourdeau continued this "business practice" even after he and C&L were served with a litigation hold demand by the Trustee in 2014, and did so knowing that his "business practice" does not ensure the preservation of all email correspondence.

e. Following the transfer of nearly all of Scott LaBonte's assets to the SALDT in the summer of 2010, the income generated by those assets continued to be paid to Scott LaBonte throughout 2010, even after the purported effective date of the transfer. Only after Scott LaBonte stipulated to a $5 million PJR in the Trustee's favor in February 2011 did the income generated by Scott LaBonte's assets that were transferred to the SALDT began to be sent to the SALDT and deposited into its bank account. Nonetheless, after Scott LaBonte stipulated to the PJR, Scott LaBonte and Sally used the SALDT bank account as their personal checking account. Sparveri testified that the SALDT was by far the most active dynasty trust he had (Sparveri had created a number of dynasty trusts for his clients, including the LaBonte Family Dynasty Trust for Roland LaBonte ("RGL")).

f. The trustees of the SALDT (which were Scott LaBonte's family members and

Sparveri) permitted Scott LaBonte to retain and exercise complete control over the SALDT and the assets that he fraudulently transferred to it. Unbelievably, Sparveri testified in litigation brought against him by a Scott LaBonte-referred client, Carl Pavano, who was also a Scott LaBonte sub-investor in the Goldberg Scheme and who has since resolved all claims with the Trustee, that:

> …to get assets in a dynasty trust [y]ou have to give up control. It's an irrevocable trust. So the settlor has to give up control. So my experience with dynasty trusts is that the settlor chooses a trustee, a quote unquote friendly trustee, whose ear he can whisper into so that he doesn't really lose control. That's the reason for having family members in there as trustees, as well as a professional person that you have a close relationship with that you know that you can be sure is going to carry out what you want to carry out and not make decisions on their own.

Sparveri testified that the SALDT operated in the same way, *i.e.*, Scott LaBonte controlled the SALDT, not his family members and close family friend who served as trustees.

g. The Putative RICO Defendants engaged in outrageous conduct in their coordinated efforts to impede the Trustee's ability to enforce the Judgment through the LaBonte Collection Actions. Indeed, in November and December 2014, while the Trustee was prosecuting a prejudgment remedy application to avoid and recover fraudulent transfers to Devcon Enterprises, Inc. ("Devcon"), the LaBonte family-owned property management company that had been majority owned by Scott LaBonte prior to him fraudulently transferring his ownership interest to the SALDT in the summer of 2010, Scott LaBonte and RGL transferred all of Devcon's assets, including its operating property management business and

10

employees, to newly created DEI Property Management, LLC ("DEIPM"). DEIPM's manger is RGL and its members are revocable trusts settled by RGL, the RGL Revocable Trust, and Marilyn P. LaBonte ("MPL"), the MPL 2015 Revocable Trust ("MPL 2015 RT"). RGL admitted in deposition testimony that Devcon's assets were transferred to DEIPM because the Trustee was seeking to attach those assets and that he would transfer DEIPM's assets, which were Devcon's assets, to a new entity if the Trustee sought to obtain a prejudgment remedy against DEIPM.

h. Bourdeau, Sparveri, RGL, MPL, Marks and others established the MPL 2015 RT in February 2015 to own 99.99% of DEIPM knowing of the pending PJR application and also knowing, as expressed in a February 2015 email from RGL to Bourdeau, that DEIPM served no purpose other than to park Devcon's business for Scott LaBonte until he could settle with the Trustee for pennies on the dollar based on his purported insolvency.

i. DEIPM has made millions of dollars in distributions to the MPL 2015 RT, the vast majority of which came from refinance transactions that pulled equity out of shopping centers and ensured that the equity could not be available for the Trustee to enforce the Judgment or any future judgments he may obtain.

j. Even worse, MGL provided Scott LaBonte and Sally with a checkbook from the MPL 2015 RT checking account and a stamp of her name thereby giving Scott LaBonte and Sally access to the MPL 2015 RT's assets and unfettered discretion over their use, allowing Scott LaBonte and Sally to use of millions of dollars that otherwise could have satisfied at least part of the Judgment to finance their

lifestyle. In short, beginning in 2015 and likely continuing through today, MPL has provided Scott LaBonte with access to all of the income generated by Devcon's assets, even though Scott LaBonte had transferred his ownership interest in Devcon to the SALDT to put that asset beyond the Trustee's reach, and even though Devcon had transferred its assets to DEIPM to put its assets beyond the Trustee's reach.

The Putative RICO Defendants' racketeering activity has not only prevented the Trustee and Receiver from providing additional Restitution to the creditor-victims of the Goldberg Scheme, it has further-harmed them by depleting the Debtors' bankruptcy estate of literally millions of dollars of litigation-related professional fees and expenses, all necessitated by the Putative RICO Defendants' coordinated efforts to protect Scott LaBonte's assets from recovery, while facilitating his continued economic enjoyment of and control over those assets and his comfortable lifestyle.

### F.  The Mediation with the Putative RICO Defendants

The Trustee prepared a draft complaint (the "Draft RICO Complaint") alleging claims against the Putative RICO Defendants, premised upon and necessitated by the Putative RICO Defendants' nearly-decade-long serial obstruction of justice, and other unlawful acts, that have successfully frustrated the Trustee's efforts to enforce the Judgment entered against Scott LaBonte. Indeed, by the date of the Judgment's entry, the Putative RICO Defendants had been successful in their efforts and had rendered Scott LaBonte judgment proof. Thus, the vast majority of the Judgment remains unpaid.[6] As of July 3, 2019, the amount owed by Scott

---

[6] The only property recovered from Scott LaBonte, by execution, was a boat in his name, which as the Court is aware the Trustee/Receiver is attempting to sell and carries an approximate value of $100,000.00 – far less than the Judgment and accrued interest thereon. In addition, settlement payments by subsequent transferees of Scott LaBonte, totaling, to date, less than $250,000.00 have reduced the Judgment.

LaBonte to the Trustee/Receiver exceeds $8.7 million.

On December 11, 2018, counsel for the Trustee and Receiver sent the Draft RICO Complaint to counsel for the Putative RICO Defendants. The Draft RICO Complaint seeks to recover from the Putative RICO Defendants' for conduct that has successfully frustrated the Trustee's efforts to enforce and collect the now more than $8 million Judgment he obtained against Scott LaBonte. The Draft RICO Complaint was sent to the Putative RICO Defendants' counsel pre-filing in an effort to settle all Scott LaBonte related claims and move toward winding down the Estate. The Trustee included an aggregate settlement demand in the letter accompanying the Draft RICO Complaint.

The Putative RICO Defendants responded to the Draft RICO Complaint and settlement demand in mid-January, 2019, and requested that the Trustee mediate his demand before filing the RICO Complaint. The Trustee's original goal, if at all possible, was to settle the Judgement without filing an action as complicated, costly and significant as a civil RICO action against, among others, established attorneys, a certified public accountant and potentially other professionals. Therefore, the Trustee agreed to mediate (the "Mediation") his claims with all of the Putative RICO Defendants. The parties ultimately agreed upon the Putative RICO Defendants' suggestion that the Hon. Holly Fitzsimmons, U.S.M.J. serve as mediator and Judge Thompson ordered the Mediation. The Mediation between the Trustee and the Putative RICO Defendants proceeded on May 1, 2019, but was not successful

## II. Amounts Sought, Obtained, Distributed to Creditors and Professionals and Amounts Which the Trustee Is Aware Will Be Sought and/or Paid by the Trustee as of the Filing of This Status Report

### A. Disbursements Approved by the Bankruptcy Court

#### 1. Distribution to Creditors

As stated above, the Trustee has distributed $8,354,651.01 to holders of allowed claims, representing in a pro rata distribution to creditors of 27.5% of their allowed claims and will reduce dollar for dollar Mr. Goldberg's Restitution obligations.

### 2. Allowed Compensation and Expenses to Zeisler & Zeisler, P.C.

The following represents all allowed compensation and reimbursements of expenses to Zeisler & Zeisler, P.C. ("Z&Z"), counsel to the Trustee. Z&Z has not been paid all such allowed compensation, as indicated below, as Z&Z has agreed to a ten-percent (10%) holdback of its fees.

| Date allowed | Fees | Expenses | Total allowed | Holdback | Total paid |
|---|---|---|---|---|---|
| 12/16/2010 | $ 597,346.00 | $ 22,433.77 | $ 619,779.77 | $ 59,734.60 | $ 560,045.17 |
| 12/12/2011 | $ 2,042,276.00 | $ 113,604.17 | $ 2,155,880.17 | $ 204,227.60 | $ 1,951,652.57 |
| 12/6/2012 | $ 2,062,172.23 | $ 42,665.46 | $ 2,104,837.69 | $ 206,217.22 | $ 1,898,620.47 |
| 12/20/2012 | $ - | $ 105,027.60 | $ 105,027.60 | $ - | $ 105,027.60 |
| 4/3/2014 | $ 1,268,262.25 | $ 42,092.04 | $ 1,310,354.29 | $ 126,826.23 | $ 1,183,528.07 |
| 11/12/2015 | $ 1,266,075.00 | $ 26,602.41 | $ 1,292,677.41 | $ 126,607.50 | $ 1,166,069.91 |
| 12/13/2017 | $ 1,016,423.05 | $ 14,281.39 | $ 1,030,704.44 | $ 101,642.31 | $ 929,062.13 |
| **Totals:** | $ 8,252,554.53 | $ 366,706.84 | $ 8,619,261.37 | $ 825,255.46 | $ 7,794,005.91 |

Z&Z, therefore, has been allowed compensation in the amount of $825,255.46, which it has not been paid, with the vast majority having been held back for five or more years, and more than fifty percent (50%) having been held back for nearly seven (7) or more years.

### 3. Other Administrative Expenses

The Trustee has made disbursements of $1,002,748.48 on account of other administrative expenses of the Estate. With the approval of the Court, the Trustee employed J. Allen Kosowsky, P.C. ("JAK") as forensic accountant to the Trustee. JAK performed various services to the Trustee over the period of several years, including providing a forensic analysis of the over $140 million of transfers in connection with the Goldberg Scheme, preparing expert reports in connection with numerous adversary proceedings brought by the Trustee, testifying at trial in connection with said

14

adversary proceedings, and providing affidavits in support of default judgments sought by the Trustee. The Estate compensated JAK a total amount of $486,613.53. The remaining administrative expenses include payments to other professionals, payments made to preserve property of the Estate, the Trustee's bond fees, and bank service fees. The total amount of disbursements made by the Estate, including the interim distribution to creditors, professional fees, and other expenses, totals $17,151,405.40.

### B. Disbursements Sought from the Bankruptcy Court

The Trustee is aware that he will seek the authorization of the Court to make disbursements on account of further administrative expenses as follows:

| Professional: | Amount Sought: | Fee Application Filed: | Hearing: |
| --- | --- | --- | --- |
| Zeisler & Zeisler, P.C. | $1,696,930.50 | July 3, 2019 | TBA |
| FTI Consulting, Inc. | $213,844.37 | July 3, 2019 | TBA |
| Osborne & Fonte | $2,849.65 | June 4, 2019 | July 2, 2019 |
| KDR Appraisal Services, LLC | $800.00 | June 20, 2019 | July 16, 2019 |
| Shechtman Halperin Savage, LLP | $1,995.00 | June 26, 2019 | July 23, 2019 |
| DarrowEverett, LLP | $1,714.00 | June 26, 2019 | July 23, 2019 |
| Neligan LLP | $24,045.76 | July 3, 2019 | TBA |

The fee application for Z&Z, which is filed concurrently with this Status Report, only seeks fees incurred in the current fee period. Z&Z is not seeking payment of the amounts of deferred compensation at this time.

### C. Total Amount in Estate Bank Accounts

As of the date of the filing hereof, the total amount in the bank accounts maintained by the Estate is $2,041,448.46.

### III.     The Trustee's Further Pursuit of the Putative RICO Defendants

As set forth in detail above, the RICO Claims are the largest remaining claims of the

Trustee and Receiver. Because of the Putative RICO Defendants racketeering activity in preventing the Trustee from collecting the Judgment against Scott LaBonte, the cost to the Estate to pursue Scott LaBonte and others has been significant. As a result, there are not sufficient funds in the Estate, after the payment of outstanding administrative expenses, to pursue the RICO Action if Z&Z were to charge on an hourly basis. The Trustee/Receiver has been considering engaging Z&Z to pursue the RICO Action on an alternative fee basis, with approval of this Court and contingent upon a satisfactory resolution of Z&Z's pending fee application. The Trustee/Receiver has discussed pursuing the RICO Action with the major creditors in this case—who represent in excess of fifty percent of claim-holders by value and with whom the Trustee/Receiver has maintained regular contact throughout this case[7]—for several months, and they are in favor of pursuing the RICO Action on an alternative fee basis. In addition, as it is his responsibility as the Receiver, the Trustee/Receiver has been discussing the RICO Action with the Office of the United States Attorney, which also supports the Trustee/Receiver commencing the RICO Action, and the Federal Bureau of Investigation—with whom the Trustee/Receiver has had continuous contact throughout the pendency of this case.

---

[7] These creditors include (with allowed amounts of claims in parentheses) JAAZ, LLC ($3,925,000), Bruce Weinstein ($6,907,500), McGee Boynton Beach LP ($3,735,000), Andrew Bennett ($2,955,000), Kevin Fournier ($1,855,000), and Raymond Faltinsky ($1,600,000).

Dated the 3rd day of July, 2019, in Bridgeport, Connecticut.

                                  JAMES BERMAN, CHAPTER 7 TRUSTEE

                                  By: /s/ John L. Cesaroni
                                         Jed Horwitt (ct04778)
                                         James Moriarty (ct21876)
                                         John L. Cesaroni (ct29309)
                                         Christopher H. Blau (ct30120)
                                         ZEISLER & ZEISLER, P.C.
                                         10 Middle Street, 15th Floor
                                         Bridgeport, CT 06604
                                         Tel. 203-368-4234
                                         Fax 203-367-9678
                                         Email: jcesaroni@zeislaw.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

---------------------------------------------------------X
                                                            :    Chapter 7
In re:                                             : 
                                                  :    Substantively Consolidated
MICHAEL S. GOLDBERG, LLC    :    Lead Case No. 09-23370 (JAM)
MICHAEL S. GOLDBERG            :    Member Case No. 09-23371 (JAM)
                                                  : 
          Debtors.                   : 
                                                 : 
---------------------------------------------------------X

**CERTIFICATE OF SERVICE**

      I, John L. Cesaroni, hereby certify that on the 3rd day of July, 2019, the *Chapter 7 Trustee's Status Report* was sent by e-mail to all appearing parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                        JAMES BERMAN, CHAPTER 7 TRUSTEE

                        By:   /s/ John L. Cesaroni
                                John L. Cesaroni (ct29309)
                                ZEISLER & ZEISLER, P.C.
                                10 Middle Street
                                15th Floor
                                Bridgeport, CT 06604
                                Tel. 203-368-4234
                                Fax 203-367-9678
                                Email: jcesaroni@zeislaw.com