**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| MICHAEL S. GOLDBERG, LLC | : | Substantively Consolidated |
| MICHAEL S. GOLDBERG, | : | Lead Case No. 09-23370 (JAM) |
| | : | Member Case No. 09-23371 (JAM) |
| Debtors. | : | |
| | : | |
| JAMES BERMAN, CHAPTER 7 TRUSTEE FOR THE ESTATE OF MICHAEL S. GOLDBERG, LLC and MICHAEL S. GOLDBERG, | : | Adv. Pro. No. 11-2071 (JAM) |
| Plaintiff, | : | |
| v. | : | |
| CARL PAVANO, ET AL., | : | |
| Defendants. | : | |

**MOTION FOR AUTHORITY TO COMPROMISE AND SETTLE CONTROVERSY WITH THE LABONTE PARTIES AND CERTAIN RELATED PERSONS**

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), James Berman, the Chapter 7 Trustee (the "Trustee") for the substantively consolidated Bankruptcy Estate (the "Estate") of Michael S. Goldberg, LLC and Michael S. Goldberg (the "Debtors"), respectfully moves for authority to compromise and settle the controversy with Scott A. LaBonte ("Scott"), individually and in his capacity as Trustee of The Scott A. LaBonte Revocable Trust (the "Sal Rev. Trust"), Sally A. LaBonte ("Sally"), individually and in her capacity as Trustee of The Sal Rev. Trust and The Scott A. LaBonte Dynasty Trust (the "SALDT"), Roland G. LaBonte ("Roland"), individually and in his capacity as Trustee of the SALDT and the

1

Roland G. LaBonte Revocable Trust (the "RGL Rev. Trust"), Marilyn P. LaBonte ("Marilyn", and together with Scott, Sally and Roland, the "LaBonte Parties"), individually and in her capacity as Trustee of The Marilyn P. LaBonte 2015 Revocable Trust (the "MPL 2015 Rev. Trust"), The Marilyn P. LaBonte Revocable Trust (The "MPL Rev. Trust") and the LaBonte Family Dynasty Trust, Joseph W. Sparveri, Jr., individually and as Trustee of the SALDT ("Sparveri"), Lawrence J. Marks ("Marks"), individually and in his capacity as Trustee of the Marilyn P. LaBonte Qualified Personal Residence Trust and the LaBonte Family Dynasty Trust, Juliano & Marks, LLC ("J&M", and together with Marks, the "Marks Parties"), and Paul L. Bourdeau ("Bourdeau", and together with the LaBonte Parties, Sparveri, and the Marks Parties, the "Settling Defendants"), on the other. The terms and conditions of the parties' settlement (the "Settlement") is set forth in the Settlement Agreement (the "Settlement Agreement") attached hereto as **Exhibit A**. In support thereof, the Trustee respectfully represents as follows.

   I.   **Introduction**

   1.   Following more than a decade of litigation, multiple unsuccessful mediations and extensive other settlement discussions over the past few years, and, more recently, months of negotiations with the Settling Defendants (through their respective counsel), the Trustee has reached what he submits is a fair and reasonable compromise of the Estate's claims against the Settling Defendants, which Settlement is in the best interests of the Estate and its creditors.

   2.   Through the Settlement, the Trustee has secured commitments to deliver to the Estate settlement payments totaling $4,465,000. This constitutes an extremely substantial amount especially considering the various costs and risks in involved, and will enable the Estate to make meaningful additional distributions to its creditors.

3.     Absent settlement, the Estate faces years-upon-years of further litigation and an appreciable degree of risk of loss on the merits. Furthermore, the collectability of the pending judgments and any additional judgments that may be obtained in the RICO Action is considerably in doubt.

4.     The parties' compromise, if approved by this Court, would bring an appropriate and beneficial conclusion to more than a decade of contested litigation against the LaBonte Parties and certain related parties. Most importantly, the payments to the Estate contemplated in the Settlement Agreement would allow the Trustee to make significant distributions to the Estate's creditors and ultimately conclude the administration of the Estate and this bankruptcy case.

5.     Thus, the Trustee respectfully asks this Court to authorize him to enter into the Settlement that he has reached with the Settling Defendants on the terms and conditions set forth in the Settlement Agreement.

II.     **Statement of the Facts and Nature of the Proceedings**

6.     On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed involuntary petitions for relief under Chapter 7 of Title 11 of the United States Code (hereinafter, 11 U.S.C. §§ 101 et seq., the "Bankruptcy Code") against Michael S. Goldberg, LLC and Michael S. Goldberg (the "Debtors"), and on November 24, 2009, this Court entered Orders for Relief in the Debtors' cases. Thereafter, this Court entered an Order jointly administering these cases.

7.     By Orders dated January 11, 2010, this Court confirmed the election of James Berman as Chapter 7 Trustee in both cases. Under these Orders and the Bankruptcy Code, the Trustee has the power, *inter alia*, to commence actions under Bankruptcy Code §§ 544, 547, 548 and 550 seeking the return of preferential and fraudulent transfers for distribution to creditors of the Estate.

### a. The Scott Judgment

8. Pursuant to these powers, on May 14, 2010, the Trustee commenced an adversary proceeding against Edward Malley ("Malley") captioned *James Berman, Trustee v. Edward Malley, et al.*, Adv. Pro. 10-02082 (the "Malley Adv. Pro.") in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court") to recover certain transfers that Malley had received from the Debtors' Ponzi scheme (the "Goldberg Scheme"). After further investigation into Scott's role in the Goldberg Scheme, on November 12, 2010, the Trustee filed his Amended Complaint in the Malley Adv. Pro., adding Scott as a defendant and asserting fraudulent transfer claims against him.

9. In June 2011, the Trustee's claims asserted in the Malley Adv. Pro. against, *inter alia*, Malley and Scott were tried over five days before the Hon. Albert S. Dabrowski. Post-trial briefing was completed on November 17, 2011.

10. Almost four years later, on March 31, 2015, Judge Dabrowski retired effective April 1, 2015. Notwithstanding, on May 11, 2015, Judge Dabrowski – with the consent of the Hon. Julie A. Manning and the Hon. Ann M. Nevins – issued his Amended Proposed Findings of Facts and Conclusions of Law (the "Amended Findings") from the Malley Adv. Pro. Scott and others filed objections to the Amended Findings, to which the Trustee responded. The Amended Findings and related filings were transmitted to the United States District Court for the District of Connecticut (the "District Court") on July 14, 2015.

11. More than two years later, on September 17, 2017, the Hon. Alvin W. Thompson issued his Order Re Proposed Findings adopting Judge Dabrowski's Amended Findings in all material respects and entering judgment in favor of the Trustee and against, *inter alia*, Scott in the amount of $7,241,797.52, together with prejudgment interest at the rate of 3.25% commencing November 12,

4

2010 (the "Scott Judgment"). (*See* Order Re Proposed Findings, issued in Civil Action No. 3:15-cv-1682 (AWT), at D.I. 815). As of July 31, 2021, the amount of the Scott Judgment inclusive of post-judgment interest and less amount s recovered is $8,738,411.[1]

### b. The Trustee's Efforts to Secure and Collect the Scott Judgment and Subsequent RICO Action

12. Scott, upon learning of the Malley Adv. Pro. and even before the Trustee amended his complaint in the Malley Adv. Pro. to include Scott transferred nearly all of his assets to the SALDT, and thereafter effectuated the transfers with an effective date of June 2, 2010—documents effectuating the transfers were executed in July and August 2010, with the effective date backdated to June 2, 2010.

13. To secure and protect the Scott Judgment for the benefit of the Estate, the Trustee commenced and prosecuted three separate fraudulent transfer actions against Scott, other members of the LaBonte Parties, their affiliated entities, and Scott former business partner, Robert A. Landino ("Landino").

14. First, on May 31, 2014, the Trustee commenced *James Berman, Trustee v. Sally LaBonte, et al.*, Adv. Pro. 14-02026 (the "SALDT Action"). In the SALDT Action, the Trustee sought to recover as fraudulent transfers the assets that Scott transferred to the SALDT upon learning of the Malley Adv. Pro., and sought to recover subsequent transfers from, *inter alia*, Sally and Devcon Enterprises, Inc. ("Devcon"), the LaBonte Family's closely held property management company.

15. Second, on May 16, 2016, the Trustee commenced *James Berman, Trustee v. Robert A. Landino, et. al.*, Adv. Pro. No. 16-02042 (JAM) (the "Landino Action"). In the Landino Action,

---

[1] The Trustee recovered the following amounts which have been applied against the Scott Judgment: $209,000 in settlement of claims against Carl Pavano as a subsequent transferee of Scott; $88,584.40 in settlement of claims against Richard Polidori as a subsequent transferee of Scott; $175,000 in settlement of claims against Landino; and $88,421.33 from the Trustee's sale of a boat that was owned by Scott.

the Trustee sought to avoid and recover certain alleged fraudulent transfers of assets held by the SALDT, and dominated and controlled by Scott, to certain entities affiliated with Landino.

16. Third, on June 2, 2017, the Trustee commenced *James Berman, Trustee v. DEI Property Management, LLC*, Adv. Pro. No. 17-02029 (JAM) (the "DEIPM Action" and, jointly with the SALDT Action and the Landino Action, the "Fraudulent Transfer Actions"). In the DEIPM Action, the Trustee sought to avoid and recover the transfer of Devcon's business and assets, then owned one-hundred percent (100%) by the SALDT, to DEI Property Management, LLC, an entity owned by Roland's RGL Rev. Trust and Marilyn's MPL 2015 Rev. Trust.

17. In the fall of 2018, the Trustee obtained documents previously withheld on the basis of attorney-client privilege in the SALDT Action pursuant to the crime-fraud exception and thereafter took a series of depositions where the witnesses could not refuse to answer specific questions based upon such privilege. These documents and depositions provided substantial new evidence, from the Trustee's perspective, of the fraudulent and by that point successful dissipation of Scott's assets and the obstructive actions of the Settling Defendants.

18. Accordingly, the Trustee prepared a draft complaint (the "Draft RICO Complaint") alleging claims against the Settling Defendants and Landino[2] under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO") premised upon the alleged conduct set forth above in obstructing the collection of the Scott Judgment.

19. On December 11, 2018, counsel for the Trustee sent the Draft RICO Complaint to counsel for the RICO Defendants in an effort to settle all Scott-related claims, make a substantial distribution to the Estate's creditors, and move toward winding down the Estate. The Trustee included an aggregate settlement demand in the letter accompanying the Draft RICO Complaint.

---

[2] Landino and the Settling Defendants are jointly referred to herein as the "RICO Defendants".

20. The RICO Defendants responded to the Draft RICO Complaint and settlement demand in mid-January 2019, and requested that the Trustee mediate his demand before filing the RICO Complaint. The Trustee's original goal, if at all possible, was to settle his claims without filing an action as complicated, costly, and significant as a civil RICO action against, among others, established attorneys, a certified public accountant, and others. Therefore, the Trustee agreed to mediate his claims with all of the RICO Defendants.

21. The parties ultimately agreed upon the RICO Defendants' suggestion of the Hon. Holly Fitzsimmons to serve as mediator. The mediation was conducted on May 1, 2019; it was not successful.

22. Eventually, following the commencement of the RICO Action described below, the Trustee moved to dismiss each of the Fraudulent Transfer Actions without prejudice as the Trustee had concluded that the continued prosecution of those actions would be futile and not in the interests of the Estate. The respective courts overseeing the Fraudulent Transfer Actions granted the Trustee's motions and, as such, none of the Fraudulent Transfer Actions remain pending.

23. Having concluded that he had been successfully frustrated in his efforts to collect the Scott Judgment, that the cost of continuing such efforts substantially outweighed their likely financial benefit to the Estate, and following the unsuccessful mediation with the RICO Defendants, on July 22, 2019, the Trustee moved to amend Zeisler & Zeisler, P.C.'s ("Z&Z") retention agreement to authorize Z&Z to pursue RICO claims against the RICO Defendants. (Trustee's Motion Pursuant to 11 U.S.C. Sections 327, 328 and 105 to Amend Zeisler & Zeisler, P.C.'s General Counsel Retention, D.I. 1732 (the "Motion to Amend Retention Agreement")). In the Motion to Amend Retention Agreement, the Trustee and Z&Z proposed that Z&Z would be compensated on a modified contingency basis for its prosecution of a RICO action, receiving *the lesser of* one-third of the net

recovery from such action or one and one-half times Z&Z's normal hourly rates. (*Id*., at 12). This Court granted the Motion to Amend Retention Agreement on July 30, 2019. (Order, D.I. 1748).

24. Thereafter, on September 27, 2019, the Trustee commenced a civil action alleging RICO claims captioned *James Berman, Trustee v. Scott A. LaBonte, et al.*, Case No. 3:19-cv-11533 (the "RICO Action") in the District Court. The Trustee asserted claims against the RICO Defendants to hold them liable for their respective alleged conduct in, *inter alia*, obstructing the Trustee in his efforts to secure and collect the Scott Judgment.

25. On December 13, 2019, the RICO Defendants filed motions to dismiss, to which the Trustee subsequently objected. On September 30, 2020, the District Court (*Bryant, J.*) denied the motions to dismiss filed by the LaBonte Parties and Sparveri and granted the motions to dismiss filed by Landino, Bourdeau, and the Marks Parties.

26. On October 7, 2020, the Trustee moved for reconsideration of the District Court's decision (the "Motion for Reconsideration") to the extent it dismissed the Trustee's claims against Landino, Bourdeau, and the Marks Parties with prejudice.

27. The District Court (*Hall, J.*)[3] granted the Trustee's Motion for Reconsideration on December 17, 2020. On January 11, 2021, the Trustee filed his Motion for Leave to Amend the Complaint in the RICO Action (the "Motion to Amend"), seeking to add additional allegations against the Marks Parties and Bourdeau.[4]

---

[3] On November 24, 2020, the RICO action was reassigned from the Hon. Vanessa L. Bryant to the Hon. Janet C. Hall.

[4] In the Motion to Amend, the Trustee also sought to add additional allegations as to Landino. However, after filing the Motion to Amend the Trustee reached a settlement with Landino, which this Court approved. (*See* Motion to Approve Settlement Agreement Between Chapter 7 Trustee and Landino Parties, D.I. 1918; Order, D.I. 1924). Thus, the Trustee subsequently withdrew his Motion to Amend as to Landino, leaving the Motion to Amend pending only as to Bourdeau and the Marks Parties.

8

28. On June 4, 2021, the District Court granted the Trustee's Motion to Amend as to the Marks Parties and denied it as to Bourdeau. Thereafter, on June 18, 2021, the Trustee filed his Amended Complaint against the LaBonte Parties, Sparveri, and the Marks Parties.

29. As the Trustee and the Settling Defendants (jointly, the "Settling Parties") had reached a settlement in principle (subject to approval by this Court), the remaining parties in the RICO Action filed a Joint Motion to Stay Case Management Order Deadlines (the "Motion to Stay") on July 13, 2021. On July 14, 2021, the District Court granted the Motion to Stay, staying all deadlines until September 15, 2021, unless further extended for good cause.

### c. The Roland Judgment

30. Separate from the Malley Adv. Pro. and the subsequent RICO Action, on August 29, 2011, the Trustee commenced an adversary proceeding captioned *James Berman, Chapter 7 Trustee v. Carl Pavano, et al.*, Adv. Pro. No. 11-02071, (the "Pavano Adv. Pro.") in the Bankruptcy Court against, among others, Roland. In the Pavano Adv. Pro., the Trustee sought to recover from Roland $425,000 in transfers that he received from the Debtors indirectly, through Scott, in connection with the Goldberg Scheme.

31. On December 10, 2018, the Bankruptcy Court held a trial on the Trustee's claims against Roland in the Pavano Adv. Pro. Thereafter, the parties filed their respective proposed findings of fact and conclusions of law on February 8, 2019. On August 28, 2020, the Bankruptcy Court entered a judgment in favor of the Trustee and against Roland in the amount of $425,000 (the "Roland Judgment"). (*See* Memorandum of Decision After Trial, issued in Pavano Adv. Pro., at D.I. 244).

32. In the months following the entry of the Roland Judgment, the Trustee has engaged in post-judgment discovery in the Pavano Adv. Pro. in an effort to identify assets that may be available to satisfy the Roland Judgment. The Trustee's efforts, to which Roland and Marks (in his capacity as

trustee of various trusts) have strenuously objected, have resulted in the production of documents and receipt of information, but have not, to date, revealed any assets held in Roland's name that are available to satisfy any part of the Roland Judgment. Thus, the Trustee has not realized any recovery on the Roland Judgment.

### d. Summary of the Terms and Conditions of the Settlement

33.   After extensive negotiation, the Settling Parties have agreed, subject to this Court's approval, to compromise and settle the Trustee's claims against the Settling Defendants pursuant to the terms of the Settlement Agreement. If approved by this Court, this compromise would resolve all outstanding disputes between the Trustee and members of the LaBonte family and their associates. By way of summary only, without limitation, the material terms and conditions of such settlement are as follows:

(i)   The LaBonte Parties shall pay to the Trustee the total amount of $3,350,000 (the "LaBonte Settlement Amount"), payable as follows: (1) $550,000 in good and immediately available funds at the Closing (as defined below); (2) $650,000 in good and immediately available funds within one year of the effective date of the Settlement Agreement (the "Effective Date");[5] (3) $1,000,000 in good and immediately available funds within two years of the Effective Date; and, (4) $1,150,000 in good and immediately available funds within three years of the Effective Date;

(ii)   Sparveri shall pay the Trustee the sum of $690,000 in good and immediately available funds at the Closing;

---

[5]   In the Settlement Agreement, the LaBonte Parties have the option of borrowing more funds against the 376 Eagle Drive, Jupiter, Florida property and making this second settlement payment in the amount of $650,000 at the Closing.

(iii)   The Marks Parties shall pay the Trustee the sum of $325,000 in good and immediately available funds at the Closing;

(iv)   Bourdeau shall pay the Trustee the sum of $100,000 in good and immediately available funds at the Closing;

(v)   The LaBonte Settlement Amount (less the $550,00 settlement payment made by the LaBonte Parties at the Closing) shall be further evidenced by a promissory note and secured by a mortgage (the "MPL QPRT Mortgage") granted by Marks in his capacity as trustee for the Marilyn P. LaBonte Qualified Personal Residence Trust, to the Trustee and the Estate against the real estate located at 376 Eagle Drive, Jupiter, Florida;

(vi)   Within fifteen calendar days of this Court's order approving the Settlement Agreement (the "Approval Order") becoming a final order (the "Final Order"), either by the exhaustion of any time required to appeal such approval, with no appeal being filed, or by the completion of any appeals filed which appeals have been finally adjudicated upholding the Approval Order, the Settling Parties shall close (the "Closing") their settlement by: (i) the Settling Defendants making the payments required by the Settlement Agreement to be made at the Closing; and (ii) the LaBonte Parties delivering the MPL QPRT Mortgage to the Trustee;

(vii)   The Trustee and the Settling Defendants mutually release all claims as set forth in the Settlement Agreement; provided, however, that the release in favor of the Scott and Roland is conditioned upon, and does not become effective until, their full

        payment of the settlement payments they are obligated to pay over time pursuant to the Settlement Agreement.

(viii)    Following the completion of the Closing fully in accordance with the terms and conditions of the Settlement Agreement, the Trustee shall file with the District Court in the RICO Action such pleading as is necessary to effectuate the termination of the RICO Action *with prejudice*; and,

(ix)    Upon the Trustee's receipt of the timely and full payment of the LaBonte Settlement Amount, the Trustee shall file a Satisfaction of Judgment in the Malley Adv. Pro. with respect to the Scott Judgment, a Satisfaction of Judgment in the Pavano Adv. Pro. with respect to the Roland Judgment and record a release of the MPL QPRT Mortgage.

**THE FOREGOING CONSTITUTES ONLY A SUMMARY OF THE TERMS AND CONDITIONS OF THE SETTLEMENT, AND THE SETTLEMENT AGREEMENT ITSELF SHOULD BE REFERRED TO AS THE EXCLUSIVE SOURCE OF ALL TERMS AND CONDITIONS OF THE SETTLEMENT REACHED BY THE PARTIES THERETO.**

34.    The Trustee is in possession of the Settlement Agreement fully executed by all of the Settling Parties. The copy of the Settlement Agreement appended hereto as **Exhibit A** does not include the Settling Parties' signatures. The Effective Date of the Settlement Agreement is August 31, 2021 (expressly subject to this Court's approval).

### III.    Jurisdiction and Venue

35.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding

pursuant to 28 U.S.C. § 157(b). Bankruptcy Rule 9019(a) provides the basis for the relief sought herein.

### IV. **Relief Requested**

36. The Trustee respectfully submits that this Court should authorize him to enter into the Settlement because the Settlement is fair and equitable and in the best interests of the Estate and its creditors.

37. Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a hearing, the bankruptcy court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The approval of a proposed settlement is within the sound discretion of the bankruptcy court, and courts will approve those settlements where it finds the proposed settlement to be in the "best interests of the estate." *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 461-65, n. 13 (2d Cir. 2007) ("*Iridium*"); *Liu v. Silverman (In re Liu)*, No. 98-5027, 1998 U.S. App. LEXIS 31698, at *2 (2d Cir. Dec. 18, 1998), *quoting* 10 Collier on Bankruptcy P 9019.02 (15th ed. 1998) ("The court should [approve a settlement] where the proposed settlement is 'both 'fair and equitable' and in the best interests of the estate.'").

38. In making the best interests finding, a bankruptcy court reviews the merits of the settlement according to the seven-factor test announced in *Iridium*. These factors are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 462 (citations and quotation marks omitted).

39. In evaluating a Rule 9019 motion, a court will not decide the numerous questions of law or fact raised by litigation, but will instead canvass the foregoing factors to see whether the settlement falls below the lowest point in the "range of reasonableness." *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied* 464 U.S. 228 (1983); *see also In re Fairfield Lumber & Supply Co.*, 214 B.R. 441, 443 (Bankr. D. Conn. 1997), *citing In re W.T. Grant and Co.* ("The ultimate issue in [evaluating a proposed settlement] is whether the proposed settlement falls below the lowest point in a range of reasonable settlements").

40. While the Trustee firmly believes that the causes of action that he has alleged against the Settling Defendants in the RICO Action are meritorious and that he should ultimately prevail in the RICO Action, he recognizes the risks inherent in litigation generally and in the RICO Action in particular. *See generally Charron v. Pinnacle Group NY LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012) (recognizing, in the context of approving a settlement of, *inter alia*, RICO claims, that "[l]itigation inherently involves risks").

41. The Settling Defendants have raised many legal and factual issues in defense of the RICO Action. The Settling Defendants have argued that no RICO enterprise ever existed. They have also disputed whether there ever had been a pattern of racketeering activity, including whether any of the Settling Defendants' actions constitute criminal predicate acts (a necessary element to establish a viable claim under RICO). The Settling Defendants have further disputed the Trustee's allegations concerning their operation of, knowledge of, and agreement to join the RICO enterprise (to the extent such an enterprise existed).

42. The Settling Defendants have argued that the "lost debt" component of the RICO claims—arising out of the non-payment of the Scott Judgment—are not ripe and that the Trustee

has improperly tried to manufacture ripeness by obtaining the dismissal of the Fraudulent Transfer Actions.

43. Alternatively, the Settling Defendants have argued that the "lost debt" claim is barred by the applicable statute of limitations. The Settling Defendants have also argued that a significant portion of the Trustee's claims to recover the attorneys' fees the Estate incurred in combating the RICO violations, including by commencing the Fraudulent Transfer Actions, which fees constitute damages subject to RICO trebling, are barred by the statute of limitations—an issue that the District Court (*Bryant, J.*) left open pending further discovery and argument by the Settling Parties.

44. Various Settling Defendants have further challenged whether their conduct constitutes an actual cause of the Trustee's damages.

45. In sum, the Settling Defendants have vigorously argued against *every* element of the Trustee's RICO claims. While the Trustee adamantly disputes the legal merits and/or factual accuracy of the Settling Defendants' contentions, he recognizes varying degrees of risk which could significantly limit or preclude altogether a recovery for the Estate.

46. Therefore, in the absence of a settlement, there is a high likelihood (if not certainty) of complex and protracted litigation, with its attendant inconvenience and delay. *See Iridium*, 478 F.3d at 462.

47. Though the Trustee's counsel represents the Estate on a modified contingency fee basis and, therefore, continued litigation does not expose the Estate to greater attorney's fees, the RICO Action's considerable factual and legal complexity necessarily results in prolonged litigation that delays payments to the Estate's creditors. Indeed, based on their litigation approach to date, the Settling Defendants would almost certainly appeal any judgment the Trustee obtains

in the RICO Action, further delaying the conclusion of the RICO Action and the closure of the Estate by multiple years.

48.     The Trustee further submits that even if he ultimately prevailed on the merits and recovered judgments in the RICO Action against the Settling Defendants, it appears clear to the Trustee that he could not recover through the enforcement of such judgments an amount, in the aggregate, even approaching the total amount to be voluntarily paid by the Settling Defendants pursuant to the Settlement.

49.     The Trustee has spent years attempting to recover from Scott through various forms of discovery and litigation, and determined that Scott has successfully denuded himself of the more than $10 million in total assets that he attested to having in the year prior to the commencement of this bankruptcy case. It also appears clear to the Trustee that in the absence of a settlement, Scott will continue to arrange his affairs in such as manner as to remain judgment-proof.

50.     In connection with post-judgment discovery in the Pavano Adv. Pro., Roland swore under oath to holding minimal assets in his name and the Trustee's own independent investigation has not established Roland's ownership of any other assets.

51.     The assets in the LaBonte Parties' revocable trusts have been fully depleted.

52.     Despite significant efforts, the Trustee has been unable to discover any meaningful assets in either of the name of Sally or Marilyn.

53.     While The LaBonte Family Dynasty Trust holds valuable assets, Roland settled this trust in 2003—well before the facts and circumstances giving rise to the claims in the RICO Action. Moreover, pursuing The LaBonte Family Dynasty Trust would require completing discovery against its trustee and certain third-parties, and obtaining sufficient information to establish viable claims against it, and then, assuming such evidence is secured, commencing,

prosecuting and prevailing in separate litigation to impose liability upon it. Even then, the Trustee would be left with having to place charging liens against the dynasty trust's interests in various closely held entities—leaving the prospect for an actual recovery in serious doubt.

54. Thus, after more than a decade of litigation attempting initially to recover fraudulent transfers from the Goldberg Scheme to Scott and Roland and then through multiple civil actions to recover additional fraudulent transfers made to related parties, the Trustee believes that it will continue to be extremely difficult to collect the Scott Judgment, the Roland Judgment, or any judgment entered in the RICO Action against the LaBonte Parties (assuming the Trustee obtains such judgments).

55. Likewise, the Trustee submits that there would likely be significant difficulty collecting substantial amounts from Sparveri, Marks, and Bourdeau (the "Professional Parties").[6] Because of the fraudulent, intentional, and criminal nature of the claims asserted by the Trustee against the Professional Parties, insurance coverage for these claims appears doubtful. The Trustee's investigation into their assets has revealed the ownership of some real estate, but not having significant value and certainly not when considering the aggregate value of the Settlement and the delays and risks involved in pursuing the RICO Action.

56. Through the Settlement Agreement, the Trustee has secured significant payments to the Estate, while avoiding the risk and delay of continued litigation. With the exception of the LaBonte Parties, all of the Settling Defendants are to make their settlement payments at the Closing, which would allow the Trustee to make a material distribution to the Estate's creditors this year. For that portion of the LaBonte Settlement Amount that is paid over time, the Trustee

---

[6] The Trustee does not presently have a RICO claim pending against Bourdeau, and would have to successfully appeal the denial of the Motion to Amend as to Bourdeau before the Trustee could even potentially obtain a judgment against him in the RICO action.

has secured such sums with the MPL QPRT Mortgage and the conditional release of the Scott Judgment and the Roland Judgment (condition upon full payment of the LaBonte Settlement Amount), and expects to make annual distributions to the Estate's creditors until the full LaBonte Settlement Amount has been paid. While the Trustee made every effort to avoid payments over time so the creditors of the Estate would receive their *pro rata* distributions immediately, the LaBonte Parties adamantly contended (and the Trustee could not establish otherwise) that they lacked the resources to pay anywhere near what the Trustee demanded without the three-year period requested to generate the LaBonte Settlement Amount.

57.   The paramount interests of the creditors are advanced by the Settlement because it realizes the largest recovery possible on account of the settled claims over a far preferable period of time when compared to the years-upon-years that would be required by further litigation of the RICO Action and, separately, against The LaBonte Family Dynasty Trust. In advance of filing this motion, the Trustee informed the core group of creditors which he has been conferring with throughout this bankruptcy case concerning the basis for and the terms and conditions of the Settlement.

58.   The Settlement Agreement is the product of arm's length bargaining over the course of years. The parties engaged in multiple mediations and, more recently, months of direct negotiations between counsel for the Trustee and various counsel for the Settling Defendants.

59.   Thus, the payments to be made to the Estate and the other terms of the Settlement Agreement constitute a fair and reasonable compromise of the Trustee's claims against the Settling Defendants which will result in the cessation of over a decade of litigation, and lead to the full administration of the Estate and conclusion of this bankruptcy case. The Trustee submits that the

Settlement Agreement is well within the range of reasonableness necessary to justify this Court's approval, is in the best interest of the Estate, and should be approved.

**WHEREFORE**, the Trustee respectfully requests that this Court enter the annexed proposed Order authorizing the Trustee to enter into the compromise and settlement reached with the Settling Defendants on the terms and conditions set forth in the Settlement Agreement, and grant such other and further relief as it deems just and proper.

Dated at Bridgeport, Connecticut, this 8th day of September, 2021.

THE PLAINTIFF,
JAMES BERMAN, CHAPTER 7 TRUSTEE FOR
MICHAEL S. GOLDBERG, LLC
AND MICHAEL S. GOLDBERG,


By: */s/ Stephen M. Kindseth*
Stephen M. Kindseth (ct14640)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT 06604
Tel. 203-368-4234
Email: skindseth@zeislaw.com
His attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify on the 8th day of September, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of this Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: */s/ Stephen M. Kindseth*
     Stephen M. Kindseth (ct14640)